**STATE of Missouri, Respondent,**

v.

**Wilber MATEO, Appellant.**

**No. WD 71117.**

Missouri Court of Appeals, Western District.

Feb. 15, 2011.

Ruth B. Sanders, Appellate District Defender, Kansas City, MO, for Appellant.

Chris Koster, Attorney General, Evan J. Buchheim, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before Division I: MARK D. PFEIFFER, Presiding Judge, and THOMAS H. NEWTON and ALOK AHUJA, Judges.

MARK D. PFEIFFER, Presiding Judge.

Following a jury trial in the Circuit Court of Jackson County ("trial court"), Wilber Mateo ("Mateo") was convicted on three counts of endangering the welfare of a child, section 568.045 RSMo Cum.Supp. 2005, three counts of abuse of a child, section 568.060,[1] and one count of first-degree assault, section 565.050 RSMo Cum. Supp 2010. The child victim is Mateo's then girlfriend's three-year-old son ("T.B."). Mateo was sentenced to twelve years for the assault conviction and seven years for each of the remaining six counts of endangering the welfare of a child and abuse of a child.[2] Mateo appeals and argues that: (1) the trial court erred in overruling Mateo's motion to suppress his custodial interrogation statement; and (2) the trial court plainly erred in permitting the testimony of the minor child victim. We disagree and affirm.

---

1. All statutory references are to RSMo 2000 unless otherwise noted.

2. The trial court ordered all sentences to run concurrently. Thus, Mateo was sentenced to a total of twelve years.

## Factual and Procedural Background

Viewing the evidence in the light most favorable to the jury's verdict,[3] the evidence presented at trial established the following:

On Sunday, April 6, 2008, T.B.'s father, M.B., left T.B. with the child's mother ("Mother"),[4] pursuant to a joint custody agreement. At that time, T.B. had no injuries except for a scratch on his leg and two small bruises on his lower back. When Mother changed T.B. into his pajamas later that evening, she did not notice any injuries to T.B. other than the scratch and two bruises.

The next day, April 7, 2008, Mother had to work from 7:30 a.m. to 3:30 p.m. Mother's then boyfriend, Mateo, agreed to watch his two-year-old daughter and T.B. while Mother was at work. While at work, Mother received two phone calls from Mateo. The first call was approximately thirty minutes after Mateo and the children dropped Mother off at work. Mateo informed Mother that T.B. had had an "accident," which Mother presumed to mean that T.B. had wet his pants. Mateo advised Mother that he would give T.B. a bath. The second call came around noon. Mateo informed Mother that T.B. had fallen down outside while playing and that he had scratches on his hands and a red mark on his face.

When Mateo picked Mother up from work at approximately 3:30 p.m., Mother immediately noticed the injuries on T.B.'s face, but thought nothing of them due to Mateo's previous explanations by phone. Later that evening, Mother noticed that there were additional injuries on T.B.'s buttocks that had not been there earlier

that morning. A couple of hours later, Mother noticed that the injuries to the victim's buttocks had gotten redder and started to blister. At bedtime, T.B. first complained to Mother that it was painful when he tried to sit down. Mother inspected T.B.'s bottom and saw more redness and blistering. She also noticed that some of the blisters had opened up. Because the injuries seemed to be getting worse, Mother took T.B. to the hospital.

While at the hospital, Mother noticed additional injuries that T.B. had suffered, including bruising on T.B.'s back, chest, and legs and scratches on his ribcage. T.B. was further examined by Angela Rabbit, a child-abuse pediatrician ("Dr. Rabbit"). Dr. Rabbit testified as to the many injuries she discovered during her examination of T.B., including: swelling on the left side of his scalp, abrasions and bruising on his face and neck, a pattern bruise with four distinct marks on his right cheek and under his chin—all consistent with punch or slap marks; redness and petechial bruising on the web of his finger—consistent with a defensive injury or sucking on the hand; linear bruising on his arm—consistent with being grabbed tightly; and bruising, lacerations, and tears on his genital area—all consistent with either suction, pulling, or pinching the genitals. Dr. Rabbit testified at trial that these injuries, when viewed collectively, were inconsistent with a single fall onto the grass as alleged by Mateo.

Dr. Rabbit testified further that the blisters on T.B.'s buttocks were caused by second-degree burns. The burns and the gradual worsening of T.B.'s condition were

---

**3.** *See State v. Moyers,* 266 S.W.3d 272, 275 (Mo.App. W.D.2008) ("This court considers the facts and all reasonable inferences derived therefrom in a light most favorable to the verdict, disregarding all contrary evidence and inferences.").

**4.** To protect the identity of the child victim, we will refer to the child victim and his father by their initials and his mother as "Mother" throughout the opinion. No disrespect is intended to any of these individuals.

534

consistent with contact with hot water. A crime scene technician testified that the water temperature from the faucet in Mateo's bathtub reached a maximum of 130° after running for three to five minutes. Water with a temperature of 130° would have caused second-degree burns in less than fifteen seconds. Dr. Rabbit testified that, in her opinion, T.B.'s injuries were the result of abuse.

During an interview with Kristen Gilgour at the Child Protection Center, T.B. told Ms. Gilgour that he did not want to sit because his bottom hurt. He stated that his mother was at work when his bottom was injured and that Mateo was there with him. In response to Ms. Gilgour's question whether someone would get in trouble if he told her why his bottom hurt, T.B. said that Mateo would get in trouble. T.B. also told Ms. Gilgour that Mateo poured hot water on his face and penis and that he was sitting in the bathtub when Mateo filled the tub with hot water which got on his bottom.

Based on this evidence, police detectives Steffan Roetheli ("Roetheli") and David Albers ("Albers") brought Mateo into the police station early the next morning. Shortly after the interview began, the detectives read Mateo his *Miranda* rights. Thereafter, Mateo made several incriminating statements to the detectives. Mateo later filed a motion to suppress his statements made to detectives during the custodial interview. Mateo's motion to suppress was overruled by the trial court after a pre-trial hearing on the matter. Consequently, Detective Roetheli testified at tri-al regarding Mateo's statements to the detectives during their custodial interview.

Mateo's case was tried before a jury on April 6–9, 2009. The jury found Mateo guilty on all counts. The trial court sentenced Mateo to seven years on each count of endangering the welfare of a child (Counts I, II, and III), seven years on each count of abuse of a child (Counts IV, V, and VI), and twelve years for first-degree assault (Count VII), with all sentences to run concurrently. This timely appeal follows.

### Point I

In his first point on appeal, Mateo argues that the trial court erred in overruling his motion to suppress and in permitting Detective Roetheli to testify as to statements made by Mateo while being interrogated because Mateo argues that his statements were obtained in violation of his rights to be free from self-incrimination, to counsel, and to due process of law.[5] Specifically, Mateo alleges his rights were violated when the detectives continued to question him after he claims he invoked his right to counsel because he did not knowingly, voluntarily, and intelligently waive his previously invoked right to counsel. We disagree.

### *Standard of Review*

When reviewing a trial court's ruling on a motion to suppress, this court may reverse only if the ruling is clearly erroneous. *State v. Shaon*, 145 S.W.3d 499, 504 (Mo.App. W.D.2004). "If the rul-

5. In Missouri, it is well established that:
[w]hen a motion to suppress evidence is denied and the evidence subsequently offered at the trial, defendant must then object to the admission of the evidence with a proper statement of the reasons for the objection, present the matter in his motion for a new trial, and brief the issue on appeal in order to preserve it for appellate review.

*State v. Howard*, 564 S.W.2d 71, 74 (Mo.App. 1978). *See also State v. Winfield*, 5 S.W.3d 505, 511 (Mo. banc 1999). We note that this issue was properly preserved for appellate review because Mateo filed a motion to suppress his statements. At trial, Mateo renewed his objection when the statements were introduced. Lastly, Mateo included this issue in his motion for new trial.

ing is plausible, in light of the record viewed in its entirety, we will not reverse, even if we would have weighed the evidence differently." *State v. Harris,* 305 S.W.3d 482, 485 (Mo.App. E.D.2010). We review all facts and reasonable inferences in the light most favorable to the challenged ruling and determine whether the trial court's factual findings are supported by substantial evidence. *Id.*

### Facts Underlying the Motion to Suppress

Mateo filed a pre-trial motion to suppress statements he made to detectives after he was arrested. The trial court held a pre-trial hearing on Mateo's motion, at which Detectives Roetheli and Albers testified. Evidence presented during the hearing showed that on April 8, 2008, Mateo was arrested and taken to the police station to be interviewed. When the detectives walked into the room to question Mateo, he announced, "I'm a complete criminal now." Mateo then told the detectives that he had given T.B. two baths that day—one shortly after they dropped T.B.'s mother off at work because T.B. had urinated on himself in the car, and one after T.B. had fallen while playing outside. At this point, the detectives started to advise Mateo of his *Miranda*[6] rights.

While Roetheli was reading him the warnings, Mateo interrupted and asked "if there was an attorney there for him" or if an attorney was "available" to him. Albers told Mateo to wait until Roetheli had finished reading his *Miranda* rights and then they would answer any questions Mateo had. When Roetheli finished reading, he gave Mateo a *Miranda* waiver form and asked Mateo to read it aloud. When finished reading the form, Mateo was given the opportunity to ask questions.[7] Mateo

then asked, "Do I need an attorney?" Roetheli told Mateo that if he didn't have anything to hide, he shouldn't need an attorney, but it was his right to have an attorney if he so desired. Mateo did not respond to Roetheli's statement nor did he mention the word "attorney" again until sometime later. Instead, Mateo put on his coat, propped his head on the table with his hand, and told the detectives that he had seen what happened to T.B. and then started describing his past criminal convictions.

After talking about his personal life for about twenty-five minutes, the detectives began questioning Mateo about T.B.'s injuries. During these questions, Mateo did not request an attorney. After Mateo described the day's events, the detectives left the room to get him a snack. When they returned, Mateo asked for a telephone to call an attorney. The detectives understood this as an invocation of Mateo's *Miranda* right to counsel and, therefore, ceased all further questioning.

### Analysis

#### Invocation of the Right to Counsel

The Fifth Amendment prohibition against compelled self-incrimination provides an accused with the right to have counsel present during custodial interrogations. *Miranda v. Arizona,* 384 U.S. 436, 478–79, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In order to safeguard that right, the United States Supreme Court has held that "law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during custodial interrogation." *Davis v. United States,* 512 U.S. 452, 454, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994)

---

**6.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**7.** Mateo did not refuse to sign the waiver form, but for some reason, the form was never signed.

(citing *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981)). Invocation of the right to counsel " 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' " *Id.* at 459, 114 S.Ct. 2350 (quoting *McNeil v. Wisconsin,* 501 U.S. 171, 178, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991)). "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," officers are not required to cease questioning. *Id.* An unambiguous request for counsel articulates a suspect's desire to have counsel present in a sufficiently clear way so "that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* If the statement fails to meet the requisite level of clarity, officers are not required to stop questioning the suspect. *Id. See also State v. Reese,* 795 S.W.2d 69, 72 (Mo. banc 1990) (questioning must cease only when the accused clearly asserts his right to assistance of counsel).

Mateo claims he invoked his right to counsel when he asked the detectives if an attorney was "there for him" or otherwise "available to him." Several Missouri cases have previously analyzed statements similar to Mateo's and have held them to be equivocal. Rather than an unambiguous request for counsel, these statements are merely questions from the defendant about the need for an attorney or the availability of an attorney. In *State v. Bucklew,* the Missouri Supreme Court held that defendant's "request" for counsel was ambiguous and equivocal where the defendant asked, "Well do you think I should have an attorney present?" and "How fast could you get an attorney here?" 973 S.W.2d 83, 90–91 (Mo. banc 1998). In *State v. Nicklasson,* after defendant received warnings

in compliance with the requirements of *Miranda,* he asked if he could stop answering questions at any time and ask for an attorney. 967 S.W.2d 596, 606 (Mo. banc 1998). The court held that this was merely a question seeking clarification of his rights as read to him and was not a " 'clear, consistent expression of a desire' " to invoke his right to counsel. *Id.* In *State v. Jones,* the court held that defendant did not unequivocally state that he wanted an attorney when he asked, "Do I need an attorney?" 914 S.W.2d 852, 861 (Mo.App. E.D.1996). Finally, in *State v. Smith,* the court held that the defendant did not definitively assert his desire to have an attorney present when the following exchange took place:

Q. [Detective] Do you understand your rights?

A. [Defendant] Yeah.

. . . .

Q. Do you wish an attorney present?

A. *You can bring one.*

588 S.W.2d 27, 30 (Mo.App. E.D.1979) (emphasis added).

Just as the defendants in the above-cited cases, when Mateo asked whether there was an attorney "there" or "available" for him, he did not unequivocally request an attorney. It was entirely reasonable for the detectives to interpret this as a question pertaining to the location and availability of an attorney should Mateo eventually invoke his right to counsel.

### Waiver

Mateo further argues: (1) that his waiver of his *Miranda* rights was not *voluntary;* and (2) that the police misled him as to the nature of his *Miranda* rights, and that his corresponding waiver was not *knowing.*

■ As recently emphasized by the United States Supreme Court:

The [*Miranda*] waiver inquiry "has two distinct dimensions": waiver must be

"voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

*Berghuis v. Thompkins*, —— U.S. ——, 130 S.Ct. 2250, 2260, 176 L.Ed.2d 1098 (2010) (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

■■■ "The state's showing that a 'defendant was informed of his rights, that he was capable of understanding those rights, and that no physical force, threats, promises, or coercive tactics were used to obtain the confession,' is prima facie evidence that the confession given while the defendant was in custody was voluntary." *State v. Johnson*, 988 S.W.2d 115, 120 (Mo.App. W.D.1999) (quoting *State v. Wilkinson*, 861 S.W.2d 746, 750 (Mo.App. S.D.1993)). Further, in order for alleged "coercive tactics" or "trickery" by police interrogation to be of a nature that makes further statements of a defendant involuntary, those tactics must demonstrate the defendant's "will was overborne" as a result of said tactics. *State v. Phillips*, 563 S.W.2d 47, 54 (Mo. banc 1978). *See also State v. Simmons*, 944 S.W.2d 165, 175 (Mo. banc 1997) ("[O]fficers' statements to a suspect that cooperating is in his or her best interests are not improperly coercive and do not, as a matter of law, render a confession involuntary.").

■■ A waiver is " 'an intentional relinquishment or abandonment of a known right or privilege,' " and "[t]he determination of whether a waiver is knowing and intelligent depends on the facts and circumstances surrounding that case and review is based on the totality of the circumstances, taking into account the background, experience and conduct of the accused." *Bucklew*, 973 S.W.2d at 90

(quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). A waiver is generally knowing and intelligent if the defendant understood the warnings—if the defendant knew he could remain silent, could request an attorney be present during the interrogation, and that the State could and would use any statement to obtain a conviction. *State v. Powell*, 798 S.W.2d 709, 713 (Mo. banc 1990).

The record does not support Mateo's contention that the waiver of his *Miranda* rights was not *voluntary* or not *knowing*.

■ Mateo was advised of his *Miranda* rights, was able to read the *Miranda* rights to himself, repeat them aloud, and ask questions about his *Miranda* rights, thereby indicating an understanding of his *Miranda* rights. Mateo was allowed to keep his coat and otherwise make himself comfortable during questioning. Mateo was not threatened or intimidated by the detectives. Mateo was not questioned for an unreasonably long period of time and, instead, was given breaks from questioning. Mateo was even provided a snack.

■ After being read his *Miranda* rights, Mateo asked if he needed an attorney. Detectives responded that "if [you] don't have anything to hide [you] shouldn't need an attorney, but it is [your] right to have an attorney if [you] want it." Mateo's challenge to the content of the warnings he was given is unpersuasive. In response to his question about his need for an attorney, the detectives repeated that Mateo had the right to an attorney—all they added was that "he shouldn't need an attorney" (not that he *did not* need an attorney) if he had nothing to hide. The detectives' statement does not affirmatively state that an attorney is unnecessary if a suspect is innocent or that a suspect who requests an attorney is necessarily guilty. Nor does it say anything as to whether the

statements of innocent or guilty suspects can actually be used against the suspect. While the detectives' statement was plainly phrased to attempt to persuade Mateo to waive his *Miranda* rights and speak to the detectives without an attorney present, it did not misrepresent or undercut the *Miranda* warnings Mateo was properly given.

Accordingly, we find substantial evidence that Mateo's waiver of his *Miranda* rights was both voluntary and knowing and not the product of "will-breaking" coercion or trickery.

Additionally, the fact that Mateo never signed the waiver does not imply that he did not understand his rights. "[A] suspect who has received and understood the *Miranda* warnings, and has not invoked his *Miranda* rights, waives the right to remain silent by making an uncoerced statement to the police." *Berghuis*, 130 S.Ct. at 2264. *See also State v. Parker*, 886 S.W.2d 908, 918 (Mo. banc 1994) ("Neither [defendant's] refusal to sign the waiver form, nor his statement that he 'ought' to talk to a lawyer, unambiguously invoked his right to counsel."); *State v. Sahakian*, 886 S.W.2d 178, 181 (Mo.App. E.D.1994) (holding the defendant's refusal to sign the waiver form and statement that he did not know what he wanted to do did not invoke the right to counsel). Mateo implicitly waived his *Miranda* rights when he began asking questions and discussing T.B.'s injuries with the police.

The trial court's ruling on Mateo's motion to suppress was not clearly erroneous. Point I is denied.

## Point II

In his second point on appeal, Mateo claims that the trial court plainly erred in allowing the State to elicit unsworn testimony from the child victim, T.B. (four years old at the time of trial). We disagree.

### *Standard of Review*

Failure to object to the procedure followed, to the ruling of the court, or to the testimony of a witness, and failure to present those matters as claimed error to the trial court in a motion for a new trial results in such alleged errors not being preserved for appellate review. These alleged errors are not resurrected for consideration when proffered for the first time via an appellant's brief. *State v. Gant*, 490 S.W.2d 46, 49 (Mo.1973). In order to preserve an issue for appeal, it must be objected to throughout trial and presented in the defendant's motion for new trial. *State v. Winfield*, 5 S.W.3d 505, 511 (Mo. banc 1999); *State v. Pennington*, 24 S.W.3d 185, 188 (Mo.App. W.D.2000). "The purpose [of objecting at trial] is to give the trial court an opportunity to correctly rule on the issue in light of the proper objection." *State v. Bivines*, 231 S.W.3d 889, 892 (Mo.App. W.D.2007). Though Mateo's trial counsel never objected to the child victim being permitted to testify at trial without taking an oath and, in fact, Mateo's trial counsel cross-examined the unsworn child victim on important issues of exculpation, Mateo now complains for the first time on appeal that the trial court erred in failing to administer an oath to the child victim prior to the child victim's testimony. Mateo acknowledges that this issue is not preserved for appeal and, instead, asks us to exercise our discretion to review his claim of error for "plain error" under Rule 30.20.[8]

Under Rule 30.20, "plain errors affecting substantial rights may be

---

**8.** All rule references are to the Missouri Rules of Criminal Procedure, 2010, unless otherwise indicated.

considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." *See also State v. Brown*, 902 S.W.2d 278, 284 (Mo. banc 1995); *State v. Hornbuckle*, 769 S.W.2d 89, 93 (Mo. banc 1989). The plain error standard should be used sparingly and "may not be used to justify a review of every point that has not been otherwise preserved for appellate review." *State v. Tokar*, 918 S.W.2d 753, 769 (Mo. banc 1996). To gain relief under plain error review, a criminal defendant bears the burden of showing not only that the trial court erred, but that the error so substantially impacted upon his fundamental rights that manifest injustice or a miscarriage of justice will result if the error is left uncorrected. *Hornbuckle*, 769 S.W.2d at 93; *State v. Roper*, 136 S.W.3d 891, 900 (Mo.App. W.D.2004). "Relief under plain error, therefore, requires that appellant go beyond a mere showing of demonstrable prejudice to show manifest prejudice affecting his substantial rights." *Hornbuckle*, 769 S.W.2d at 93. The criminal defendant seeking relief on grounds of plain error bears the burden of showing *both* plain and obvious error *and* that a manifest injustice or miscarriage of justice has occurred. *Bivines*, 231 S.W.3d at 892; *State v. Vanlue*, 216 S.W.3d 729, 734 (Mo. App. S.D.2007).

### Facts Underlying T.B.'s Unsworn Testimony

The prosecutor asked T.B. to take the stand in order to testify regarding his injuries. The transcript indicates that T.B. was not formally sworn in or asked to take an oath. There was no objection to this procedure or to T.B.'s testimony. The prosecutor asked T.B. to state his name, age, and to identify some body parts on a drawing. T.B. answered the questions and identified his injuries on the pictures. At the end of her direct examination, the prosecutor asked several questions to establish that the child victim knew the difference between the truth and a lie. The following exchange took place:

Q. [Prosecutor] [T.B.], if I said that I was wearing a red jacket, is that a truth or a lie?

A. [T.B.] A lie.

Q. What color is my jacket?

A. Black.

Q. If I said that you had on Sketchers tennis shoes, is that a truth or a lie?

A. A truth.

Q. And is it important that we tell truths or lies?

A. Truths.

Q. And did you tell the truth here today?

A. Yeah.

After the prosecutor finished with her direct examination, Mateo's trial counsel cross-examined T.B., in which the following colloquy took place, in pertinent part:

Q. Okay. You remember being in the hospital, right?

A. Yeah.

Q. And that was over a year ago?

A. Yeah.

Q. And the day that you got those owies, you talked to your mommy on the phone a few times that day?

A. Yeah.

Q. Yeah. And you told your mommy that you fell down?

A. Yeah.

Q. Yeah. You didn't tell your mommy that [Mateo] caused those owies, did you?

A. Yeah.

Q. You told her that or you didn't tell her that?

A. I didn't.

Q. You didn't?

A. No.

Q. And you didn't tell the doctor that either, did you?

A. No.

Q. Okay. And the only thing that you said was that you fell down, right?

A. Yeah.

. . . .

Q. Did anyone tell you to say that [Mateo] caused these injuries?

A. I don't think so.

Q. You don't think so, you're not sure?

A. I'm not sure.[9]

### Analysis

For the first time on appeal, Mateo complains that the trial court committed reversible error in failing to administer an oath to T.B. or otherwise establish T.B.'s present understanding of the obligation to give truthful testimony before T.B. testified at the trial. Irrespective of whether or not the trial court committed any error on this topic, we conclude that Mateo has failed to demonstrate any manifest injustice in the proceedings below, and we decline to exercise our discretion to consider Mateo's claim of error under the plain error review standard.

To bring context to our conclusion that Mateo has failed to demonstrate manifest injustice, we address the distinction between competing legal principles that Mateo has improperly conflated in his argument to this court: (1) competency of a child witness; and (2) administration of an oath to a child witness.

### The Test for Competency of a Child Victim Witness

This case involves a child *witness* who is under the age of ten and also alleged to be a *victim* of a criminal offense pursuant to Chapters 565 and 568, RSMo. The issue of testing the competency of a child *witness* who is also a child *victim* has been modified over the years due to legislative revisions to section 491.060(2). Prior to 1984, section 491.060(2) stated:

> The following persons shall be incompetent to testify: (2) A child under ten years of age, who appears incapable of receiving just impressions of the facts respecting which he is examined, or of relating them truly.

Prior to 1984, our Missouri Supreme Court interpreted this pre–1984 version of section 491.060(2) to mean:

> The test of *competency* of a child of tender years involves four fundamental elements, *all of which should be present* in order for such child to be competent to testify, viz.: (1) *Present understanding of* or intelligence to understand, on instruction, *an obligation to speak the truth*;[10] (2) mental capacity at the time of the occurrence in question truly to observe and to register such occurrence; (3) memory sufficient to retain an independent recollection of the observations made; and (4) capacity truly to translate into words the memory of such observation.

*State v. Starks*, 472 S.W.2d 407, 408 (Mo. 1971) (emphasis added) (numerous internal citations and quotations omitted).

Subsequently, in 1984, Missouri's legislature statutorily removed the "test for com-

---

9. Needless to say, while the defense did not carry the day at the trial below, this cross-examination by Mateo's trial counsel demonstrated skill in obtaining important information from one of the State's lead witnesses to contradict the State's case in chief.

10. Much of the focus of Mateo's argument on appeal is that the trial court failed to ascertain T.B.'s "present understanding" of T.B.'s "obligation to speak the truth." As is discussed *infra*, this is a test for competency and has been statutorily removed as a precondition to the testimony of a child victim witness such as T.B.

petency" and all testimonial "qualifications" for certain child witnesses, save for mental incapacitation. In 1984, section 491.060(2) was modified to add a proviso to the existing language of that section. The proviso states, in pertinent part:

> [E]xcept as provided in subdivision (1) of this section [mental incapacitation], a child under the age of ten who is alleged to be a victim of an offense pursuant to chapter 565, 566 or 568 *shall* be considered a *competent witness and shall be allowed to testify without qualification* in any judicial proceeding involving such alleged offense. The trier of fact shall be permitted to determine the weight and credibility to be given to the testimony.

§ 491.060(2) (emphasis added).

After the 1984 revision, our Missouri Supreme Court examined the constitutionality of the revision to section 491.060(2) in *State v. Williams*, 729 S.W.2d 197 (Mo. banc 1987), *cert. denied*, 484 U.S. 929, 108 S.Ct. 296, 98 L.Ed.2d 256 (1987). First, the *Williams* court identified the practical ramification of the 1984 revision:

> The 1984 proviso in question then simply removes the need for a judicial determination of *competency* in those cases where a child of tender years is a *victim* of one of the delineated offenses.

*Id.* at 199 (emphasis added).[11]

Stated another way, if a child *witness* is under the age of ten, does not suffer from mental incapacitation, and is also alleged

to be a *victim* of a criminal offense pursuant to Chapter 565, 566, or 568, it is not necessary for the court to ascertain whether such child victim witness possesses: (1) a present understanding of the obligation to speak the truth; (2) the capacity at the time of the occurrence to observe and register such occurrence; (3) the memory sufficient to retain an independent recollection of the observation made; or (4) the capacity to translate into words the memory of such observation—before such child victim witness testifies in the criminal proceeding.

As the *Williams* court explained the legitimacy of the legislature's rationale for the 1984 proviso:

> [T]he remedy of excluding such a witness, who may be the only person available who knows the facts, seems inept and primitive. Though the tribunal as unskilled [i.e. jury], and the testimony difficult to weigh, it is still better to let the evidence come in for what it is worth. . . .

*Id.* at 200 (quoting *McCormick on Evidence*, § 62 (1984)).

Next, our Missouri Supreme Court rejected arguments that the 1984 amendment to section 491.060(2) violated a defendant's due process rights guaranteed under both the Missouri and United States Constitutions. *Id.* at 200–02. In so explaining its ruling, the Missouri Supreme Court stated:

> Section 491.060(2), by allowing the child victim to testify without any further

11. In *Williams*, the convictions arose out of alleged incidents of sexual abuse and other assaults involving an eight-year-old child victim. *Id.* at 198. Over the objections of the defendant, the child victim was permitted to testify without a prior determination of competency. *Id.* The convicted appellant argued that section 491.060, RSMo 1986, which allowed the child victim to testify without any further qualification, was constitutionally flawed for numerous reasons, none of which

were accepted by the Missouri Supreme Court. *Id.* While it is clear that the trial court in *Williams* did not conduct a test of the child victim's competency prior to allowing the child victim to testify, there is no reference in the opinion as to whether the trial court administered any sort of oath to the child victim or any discussion by the court as to whether such an oath was required after the 1984 amendment to section 491.060. *Id.*

qualification did not deprive appellant of a meaningful opportunity to defend against the abuse charges. *The statute merely insured that the child could testify*[12] and did not affect appellant's right to raise and pursue whatever defenses he may have had. He had the opportunity to cross-examine the child as to issues related to her maturity and her ability to recollect and relate the events of which he was accused.

. . . .

Appellant had an opportunity for effective cross-examination of [the child victim] and did in fact cross-examine her as to all issues.

*Id.* at 201–02 (emphasis added).

▓▓▓ The same is true in the instant case. The child witness, T.B., was under the age of ten, there was no finding and there is no argument by Mateo that T.B. was mentally incapacitated at the time of trial, and T.B. was alleged to have been a victim of criminal offenses arising pursuant to Chapters 565 and 568, RSMo. Therefore, pursuant to section 491.060(2), it was *not* incumbent upon the trial court to ascertain whether T.B. had any sort of present understanding of the obligation to give true testimony *before* or even *after* permitting T.B. to testify.[13] Instead, Mateo had the opportunity to, and did, effectively cross-examine T.B. about issues related to T.B.'s maturity and his ability to recollect and relate the events of which Mateo was accused and to further cross-examine T.B. as to whether someone had coached T.B. to accuse Mateo of harming T.B.

Nothing in section 491.060(2) prohibits trial counsel or self-represented defendants from inquiring of a child victim witness like T.B. (i.e. one who qualifies as a child under ten years of age, is an alleged victim of one of the statutorily delineated offenses, and is not otherwise mentally incapacitated) whether the child victim witness understands the obligation to give true testimony. That is certainly the type of testimony designed to provide evidence as to the child victim's credibility. But, after the 1984 revision to section 491.060(2), such testimony can no longer be *required* of a child victim witness like T.B. before such child victim witness is deemed competent to testify in the pertinent criminal proceeding.

*Administration of Oath to Child Witness*

While it is undisputed that section 491.060(2) eliminates the necessity for a trial court to determine the *competency* of a child victim witness such as T.B., does it necessarily follow that the trial court has no obligation to administer an *oath* to a child victim witness such as T.B.?[14]

---

12. Though this statement suggests that section 491.060(2) conveys an absolute right upon a child victim under the age of ten to testify at certain criminal proceedings, the only issue presented in *Williams* was a challenge to the statute's elimination of the requirement to establish the competency of such a child victim witness prior to testimony from such witness. The question of whether an oath was still required to be administered to such witness prior to testimony from the witness was not raised or addressed by the *Williams* court.

13. However, T.B.'s testimony did, in fact, exhibit T.B.'s understanding of the difference between truth and lies.

14. Section 491.380(2) states, in pertinent part: "Every person offered as a witness, before any testimony shall be given by him, shall be duly sworn. . . ." Stated another way, when section 491.060(2) states that a child victim witness under the age of ten "shall be considered a *competent* witness *and* shall be allowed to testify *without qualification* in any judicial proceeding involving such alleged offense (offense pursuant to chapter 565, 566, or 568)," does this mean that the "qualifica-

We have found no case subsequent to the 1984 revision to section 491.060(2) that specifically addresses the applicability of section 491.060(2) to the necessity of qualifying a child victim witness under the age of ten to testify prior to being sworn. There are, however, numerous cases that have addressed the administration of an oath to child witnesses, including cases involving post–1984 child victim witnesses.

 The administration of a formal oath is not a prerequisite to the trial court's acceptance of a child witness's testimony. *State v. Patterson*, 569 S.W.2d 266, 270 (Mo.App.1978); *Starks*, 472 S.W.2d at 409 ("A child need not understand the term 'oath' in order to give testimony, provided the child exhibits some present understanding of the obligation to give true testimony."). Consequently, "the appropriate inquiry is not restricted to whether the child understands particular words or knows the specific consequences of failing to tell the truth in a courtroom, but whether the child has 'a practical understanding of the abstract concepts of truth and falsity.'" *Patterson*, 569 S.W.2d at 270 (quoting *State v. Sanders*, 533 S.W.2d 632, 633 (Mo. App.1976)). "'The important feature, regardless of the form of oath, is its quickening of the conscience of the witness and the liability it creates for the penalty of perjury.'" *Kovacs v. Kovacs*, 869 S.W.2d 789, 792 (Mo.App. W.D.1994) (quoting *State v. Bowlin*, 850 S.W.2d 116, 117 (Mo. App. S.D.1993)). *See also State v. Ward*, 242 S.W.3d 698, 703 (Mo. banc 2008); *Bell v. Bell (Estate of Bell)*, 292 S.W.3d 920, 925 (Mo.App. W.D.2009).

In *Kovacs*, we addressed the issue of plain error review of the failure of the trial court to administer an oath to a fourteen-year-old witness testifying in a dissolution and custody proceeding involving her parents. *Kovacs*, 869 S.W.2d at 792. Aside from the fact that this case does not address the "section 491.060(2) child victim witness under the age of ten issue," it is notable that we denied the plain error relief requested in *Kovacs* on the basis that, while there was no oath, there was "sufficient evidence in the record the witness understood the importance of telling the truth." *Id.*

In *Guese v. State*, 248 S.W.3d 69 (Mo. App. S.D.2008), the defendant-appellant made a Confrontation Clause argument in objection to the trial court permitting the six-year-old child victim witness to testify in a courtroom position in which the child witness did not have to face the defendant-appellant. *Id.* at 73. In rejecting the defendant-appellant's argument, the court included a gratuitous footnote referring to the fact that although the child victim witness was not given a traditional oath, the child victim witness was asked a series of questions involving the difference between a lie and the truth and the child victim witness expressed a clear understanding of the importance of telling the truth while in the courtroom. *Id.* at 74 n. 4. In the same footnote, the court indicated that such testimony from the child victim witness "[met] the important purposes aligned with administering an oath to witnesses who take the witness stand." *Id.*

Finally, in *State v. Uelentrup*, 910 S.W.2d 718 (Mo.App. E.D.1995), the defen-

tion" of an oath is unnecessary? In other words, if the test for competency of child witnesses includes ascertaining whether the child witness has a "present understanding of the obligation to speak the truth" and the test for competency is eliminated for certain child victim witnesses by operation of section 491.060(2), how can one administer an oath to a witness that does not possess a present understanding of the obligation to speak truthfully? The answer to these questions, as discussed *infra*, must wait for another day and another appeal when the issue has been properly preserved for appellate review.

dant-appellant did, in fact, preserve his objection to unsworn testimony provided by two child victim witnesses under the age of ten. *Id.* at 722. While there was no discussion of section 491.060(2) in *Uelentrup,* the court concluded that the trial court had not abused its discretion in permitting the unsworn testimony of the child victim witnesses under the age of ten because there was sufficient evidence in the record to demonstrate that both witnesses understood the importance of telling the truth. *Id.* In identifying the evidence that the court found sufficient to comply with the purpose and requirement of the oath, the court pointed out that both child victim witnesses were able to correctly state their name, age, birthday, grade in school, name of school, name of teacher, and knew what a lie was and that it was "bad" to tell a lie. *Id.*

 Applied to the present case, T.B. was correctly able to testify as to his full name, age, date of birth, that he knew the difference between truth and lies, and that he understood the importance of telling the truth in the courtroom. There was no objection to T.B.'s testimony, and instead, *after* T.B. had demonstrated through his testimony that he had a practical understanding of what it meant to tell the truth and the importance of doing so, Mateo's counsel proceeded to cross-examine T.B. as detailed *supra.*

Even the cases cited by Mateo finding errors relating to the failure to administer an oath do not adopt the rule of automatic prejudice from the lack of a proper oath alone. For example, in *Estate of Bell,* a contemporaneous objection was made that an attorney's unsworn statements of opinion on a disputed factual issue did not constitute evidence. *Estate of Bell,* 292 S.W.3d at 924. Further, we noted not only that counsel (as a testifying witness) took *no oath before offering his opinion testimony,* but that counsel was not subject to cross-examination, and that no foundation was laid that the testifying attorney even had expertise which qualified him to provide such testimony at all. *Id.* at 927.

Conversely, in the present case, Mateo simply fails to establish any prejudice resulting from the trial court's admission (without objection) of T.B.'s testimony. Absent prejudice, it follows that Mateo certainly cannot establish manifest injustice resulting from T.B.'s testimony—testimony that bore with it substantial evidence that T.B. understood the difference between telling the truth and telling a lie, and the corresponding importance to tell the truth during his testimony in court.

We need not and do not discuss whether section 491.060(2) abrogates the responsibility to administer some version of an oath to a child victim witness under the age of ten when the criminal defendant is charged with certain crimes. The issue was not preserved for appellate review, and Mateo fails to demonstrate prejudice rising to the level of manifest injustice to justify plain error review.

Point II is denied.

### Conclusion

Finding no reversible error below, the judgment of the trial court is affirmed.

THOMAS H. NEWTON and ALOK AHUJA, JJ., concur.