STATE of Missouri, Plaintiff–
Respondent,

v.

Wendell R. ARMSTRONG,
Defendant–Appellant.

No. 24466.

Missouri Court of Appeals,
Southern District,
Division Two.

April 26, 2002.

**328**

Ellen H. Flottman, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General and Audara L. Charlton, Assistant Attorney General, Jefferson City, for respondent.

PHILLIP R. GARRISON, Presiding Judge.

Wendell R. Armstrong ("Defendant") was charged by amended information[1] with murder in the second degree, in violation of Section 565.021.[2] Following a bench trial, he was found guilty and was sentenced to life imprisonment. Defendant appeals.

At 11:30 to 12:00 on the night of June 27, 2000, Defendant was taken to the home of Calvin and Hope Renee Lacey by his son, Jeremy, after having played "quarters" and drinking with Jeremy and his friends. Defendant had become acquainted with the Laceys earlier that month, and had given Mrs. Lacey a half-interest in a vehicle he owned, a ring, and other gifts. He also wore a locket containing a picture of Mrs. Lacey.

During the early morning hours of June 28, 2000, Defendant and Mr. Lacey drank steadily. Defendant began to talk about killing himself because he and his wife were getting a divorce. This aggravated Mr. Lacey, and he commented that suicide would be "stupid." Defendant, however, continued to talk about suicide, and Mr. Lacey, tiring of the topic, said that he would help Defendant end his life and threw a barstool at him. Shortly after that Defendant, Mr. Lacey, and Mrs. Lacey went outside together, and Defendant and Mr. Lacey got into another fight. Mr. Lacey grabbed Defendant and "push[ed] him down on the steps." During the fight-

---

**1.** In exchange for Defendant's waiver of a jury trial, the charge was amended from murder in the first degree to murder in the second degree, and a charge of armed criminal action was dropped.

**2.** All statutory references are to RSMo 2000, unless otherwise indicated.

ing, Mrs. Lacey heard Defendant tell Mr. Lacey that "he would just as soon shoot 'em as to look at 'em or fight him." Defendant later said, "[T]hat's okay, you son of a bitch, you're already dead anyway." Mrs. Lacey went back into the house. When she returned a few minutes later, Defendant and Mr. Lacey had quit fighting. They apologized to each other, hugged, and shook hands.

Defendant left the Lacey's home, and walked to the Double Nickel, a nearby bar, where he called Jeremy to come get him. Jeremy arrived a few minutes later and picked up Defendant. Defendant told Jeremy that he wanted to go back to the Lacey's home to pick Mr. Lacey up so that the men could drink some more. Defendant and Jeremy arrived at the Lacey's home, and Defendant told Mr. Lacey to go with him to the river, so that they could drink some more. Mr. Lacey told his wife that he was worried that something might happen to him. She told him not to go with Defendant, but Mr. Lacey went, taking a gun and a pipe with him for protection.

Defendant, Jeremy, and Mr. Lacey drove to Cottonwood Point where the men sat on an old barge drinking and talking. At some point after Mr. Lacey finished off a bottle of beer, he threw the empty bottle into the water, pulled out a gun, and shot at the bottle. Defendant and Jeremy told Mr. Lacey to put the gun away. Mr. Lacey gave the gun to Jeremy to hold, and Mr. Lacey and Defendant decided to go swimming in the river. Jeremy stayed on the old barge watching Defendant and Mr. Lacey swimming in case either ran into trouble in the water. A few minutes later, Jeremy went to the other end of the barge to urinate. He sat the gun down on the barge, and Defendant took it. Defendant climbed up on the barge, squatted down, and pointed the gun approximately a foot

or foot and a half from Mr. Lacey's head. Defendant said, "I told you if you ever tried to hurt me again I'd kill you, now swim or die." Jeremy told Defendant, "[I]t ain't worth it, don't do it." To this, Defendant replied, "Jeremy, you need to leave, you don't need to see this." Jeremy started walking away from Defendant, and yelled at Defendant once again to not do it. Just shortly after that, Jeremy heard a shot fired and ran to call 911.

A police officer arrived on the scene approximately ten to fifteen minutes later. The officer spotted Defendant walking out of the woods up to the barge. Defendant showed the officer where he had hidden Mr. Lacey's gun in his shoe under a hollowed out log. The officer secured the gun and noted that it contained one spent shell casing inside of it. Defendant was read his Miranda rights, and stated that he understood them. Defendant then said that he had fired a couple of shots, but was not sure whether he had hit Mr. Lacey. Another officer transported Defendant to the police station, but did not question him during the ride.

Around 11:00 a.m. on June 28, 2000, Chris Riggs ("Riggs"), an investigator for the Pemiscot County Sheriff's Department, approached Defendant to question him about the shooting. Prior to this, Defendant had been sleeping. Riggs read Defendant his Miranda rights, and Defendant signed the waiver form. Defendant agreed to talk to the officers, and then stated that although he probably should not talk, he wanted to get this "cleared up." He also stated that his wife worked for an attorney, and that he knew what his rights were and how the process worked. At this time, Riggs did not believe Defendant was intoxicated. According to Riggs, Defendant appeared to be very coherent and was "thoughtful in his thinking process."

During the interview, Defendant stated that the night before, he had been upset with Mr. Lacey and "wanted to get [Mr. Lacey] back." Defendant first stated that Mr. Lacey had tried to attack him while they were swimming in the water, but when informed that Jeremy had told a different story, Defendant recanted and stated that Mr. Lacey had not tried to attack him. Defendant also stated that he had climbed out of the water, grabbed a piece of driftwood, and had tried to knock Mr. Lacey's hands off of the barge cable. Defendant stated that when this did not work, he told Mr. Lacey to "swim or die" and pointed the gun at Mr. Lacey's head and fired. Defendant admitted that the reason why he did not tell the truth the first time was because he was scared that he was "going to go to the penitentiary for the rest of his life." At approximately 1 p.m., Defendant was again read his Miranda rights, and then a videotaped statement was taken. On the videotape, Defendant again admitted to shooting Mr. Lacey and stated that he knew that the bullet had to have hit Mr. Lacey in the head.

Mr. Lacey's body was later recovered down river in Arkansas. The coroner testified at trial that the cause of death was a gunshot wound to the head.

At trial, Defendant testified that while he and Mr. Lacey had been swimming, Mr. Lacey had tried to choke him. He stated that Mr. Lacey threatened him and that he shot Mr. Lacey in self-defense. At the close of the evidence and arguments, the trial court found Defendant guilty of murder in the second degree, and he was sentenced to life imprisonment. Defendant appeals.

In his sole point on appeal, Defendant contends that the trial court erred in overruling his motion to suppress the statements he gave to the police and in admitting the statements into evidence.

He argues that the statements were involuntary, unknowing, and unintelligent under the totality of the circumstances because he "was so intoxicated that he was unable to appreciate the nature and consequences of his statements."

On motions to suppress, the State bears the burden of showing by a preponderance of the evidence that the motion should be denied. *State v. Mitchell*, 2 S.W.3d 123, 124 (Mo.App. S.D.1999). A trial court's ruling on a motion to suppress will not be upset on review if it is supported by substantial evidence. *State v. Smith*, 944 S.W.2d 901, 910 (Mo. banc 1997).

The test for voluntariness of a statement is whether, under the totality of the circumstances, the defendant was deprived of free choice to admit, to deny or to refuse to answer, and whether physical or psychological coercion was of such a degree that the defendant's will was overborne at the time he confessed. *Mitchell*, 2 S.W.3d at 126. The proper focus of such a challenge is whether coercive police activity occurred. *Smith*, 944 S.W.2d at 910. "Regardless of a defendant's physical or emotional condition, including his or her level of intoxication, a confession is not involuntary within the meaning of the due process clause of the fourteenth amendment absent coercive police activity." *Mitchell*, 2 S.W.3d at 126. *See also Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 480 (1986).

In the instant case, there was no evidence presented of any coercive police activity, and Defendant makes no argument that the police engaged in coercive activity in eliciting his statements. Defendant cites to *State v. Heather*, 498 S.W.2d 300, 304 (Mo.App.St.L.D.1973), for the proposition that his intoxication alone could render his statement involuntary.

However, *Heather* was decided before *Connelly,* which held that coercive police activity is a necessary predicate to a finding that a confession is involuntary. *See Connelly,* 479 U.S. at 167, 107 S.Ct. at 522, 93 L.Ed.2d at 480. Accordingly, Defendant's reliance on *Heather* is misplaced.

■ In deciding whether a waiver is knowing and intelligent, the reviewing court considers the totality of the circumstances. *State v. Powell,* 798 S.W.2d 709, 713 (Mo. banc 1990). The requirement that a waiver of rights be knowing and intelligent does not require that a defendant must know and understand all of the possible consequences of the waiver. *Id.* Rather, it requires that the defendant understood the warnings themselves, that at all times knew that he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction. *Id.* "A knowing and intelligent waiver of the right to silence is normally shown by having a police officer testify that he read the accused his rights, asked whether the rights were understood, and received an affirmative response." *State v. Wise,* 879 S.W.2d 494, 505 (Mo. banc 1994).

■ Additionally, a defendant can validly waive his rights even if he has a deficient mental condition caused by intoxication. *See State v. Knese,* 985 S.W.2d 759, 766 (Mo. banc 1999). "[A] deficient mental condition, whether manifested by delusional behavior or a positive drug test, does not by itself render a statement unintelligent. A defendant does not have the constitutional right 'to confess to his crime only when totally rational and properly motivated.'" *Id.* at 766. Further, it has been held that intoxication at the time of the confession does not render a confession unknowing and unintelligent unless the intoxication rises to a mania. *State v. Loazia,* 829 S.W.2d 558, 566 (Mo.App. E.D.

1992). Rather, the fact of intoxication goes to the weight and credibility to be accorded the statement. *Id.See also Mitchell,* 2 S.W.3d at 128.

In *Mitchell,* the defendant consumed alcohol and then shot his friend. The police read the defendant his Miranda warnings several times and gave him a breath test, which showed his blood alcohol content to be .24%. The defendant then gave two taped statements, about eleven hours apart. On appeal, the defendant contended that the trial court erred in overruling the defense counsel's motion to suppress his statements to police officers because they were involuntarily, unknowingly, and unintelligently made due to the fact that the defendant was so intoxicated that he was unable to appreciate the nature and consequences of his statements. *Mitchell,* 2 S.W.3d at 126. The court held that the evidence was sufficient to show that the defendant understood the warnings themselves, and therefore the trial court did not clearly err in overruling his motion to suppress. *Id.* at 128.

Similarly, in the instant case, the evidence showed that Defendant understood the Miranda warnings. Here, Defendant was read his Miranda rights three times, including before the making of the videotaped statement at the police station. Defendant also signed a form stating that he understood his rights and was waiving them. He told the officers that his wife worked for an attorney, that he was familiar with his rights, and that he wanted to get things "cleared up." Defendant was responsive to the officer's questions during the interviews. Contrary to Defendant's assertion that he came "across on that tape as a man just barely holding it together," and that he was "loquacious and rambling, and obviously still intoxicated," Defendant spoke calmly and deliberately

throughout the course of the taped interview. The evidence shows that although Defendant may have been intoxicated at the time of the shooting, he was able to understand his rights during the three separate occasions that he admitted shooting Mr. Lacey. Therefore, we find that the trial court did not err when it overruled Defendant's motion to suppress the statements he made to law enforcement officials. Defendant's point is denied.

The judgment of the trial court is affirmed.

PREWITT, J., and PARRISH, J., concur.