STATE of Missouri, Appellant,

v.

Douglas E. PENNINGTON,
Respondent.

No. WD 75506.

Missouri Court of Appeals,
Western District.

June 11, 2013.

Motion for Rehearing and/or Transfer
to Supreme Court Denied July
30, 2013.

Application for Transfer Denied
Oct. 1, 2013.

Eric G. Zahnd, Prosecuting Attorney, Joseph W. Vanover, Assistant Prosecuting Attorney, Platte City, MO, for Appellant.

Susan L. Hogan, Appellate Defender, Kansas City, MO, for Respondent.

Before Division Two: KAREN KING MITCHELL, Presiding Judge, and THOMAS H. NEWTON and LISA WHITE HARDWICK, Judges.

KAREN KING MITCHELL, Presiding Judge.

The State appeals from the circuit court's interlocutory order suppressing oral and written statements made by Douglas Pennington during a police interview. The State argues that the circuit court applied an incorrect legal standard in requiring the State to demonstrate an express waiver of Pennington's rights to remain silent and have counsel present during questioning. In *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 2261, 176 L.Ed.2d 1098 (2010), the United States Supreme Court held that express waivers are not required in order to demonstrate compliance with the prophylactic warnings mandated by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Because the circuit court applied an incorrect legal standard in suppressing the statements, we reverse and remand for further proceedings.

## Factual Background

In March 2011, S.M. (Mother) and M.M. (Father) contacted the Riverside Police Department to report that Pennington had committed sexual acts against their minor daughter (Child). The police department was unable to reach Pennington but left a voicemail for him to contact Detective Billy Aaron. In response to the voicemail, Pennington voluntarily went to the police station and was interviewed by Detective Aaron. The entire interview was videotaped, and the recorded interview was later admitted into evidence at the suppression hearing.

At the beginning of the interview, Detective Aaron asked Pennington whether he had ever been to the police station before. Pennington said that he had recently visited the station to file a police report after he was assaulted by a neighbor. Detective Aaron briefly questioned Pennington about the alleged assault (an incident wholly unrelated to Detective Aaron's investigation at issue in this case) and then the following exchange took place:

> Detective Aaron: I heard that you keep a pretty close eye on stuff out there and, from time to time, you've given police some good information.
>
> Pennington: Yeah, if anything looks strange going on or anything, I call down here and let 'em know what's going on.
>
> Detective Aaron: Good deal. Here's the situation. When you came down and talked, I'm sure they probably went over

this with you the other day, but—our business is protection.

Pennington: Right.

Detective Aaron: We want to protect people's rights—

Pennington: Right.

Detective Aaron:—public safety, et cetera—and certainly yours.

Pennington: Right.

Detective Aaron: So, part of my obligation is to make sure you understand your protections.

Pennington: Right.

Detective Aaron: Okay, so this is some paperwork we go through so we can visit.

Then, after confirming that Pennington had graduated high school and could read and understand English, Detective Aaron handed Pennington a form containing the *Miranda* warnings and asked him to read it aloud. Pennington complied and read the *Miranda* form correctly. The final line of the form read: "Each of the above rights has been explained to me and I understand them." When Pennington finished reading the *Miranda* form in its entirety, Detective Aaron asked Pennington twice if he understood the rights he had just read aloud, and both times Pennington answered affirmatively. Detective Aaron told Pennington that his signature would further confirm that he understood his rights. Pennington then signed the *Miranda* form.[1]

After the form was signed, Detective Aaron engaged Pennington in preliminary conversation about his family and employment. During that conversation, Pennington reported that he was on probation for a felony conviction.

Approximately ten minutes after the *Miranda* warnings were administered, Detective Aaron turned the conversation to the sexual misconduct allegation reported by Mother and Father. Pennington was aware, before he went to the police station, that Child had made sexual allegations against him. Pennington told Detective Aaron that Mother and her family were his neighbors. He said that Mother asked him to babysit Child and Child's brother for approximately five to six hours on the day of the alleged offense. In response to questions from Detective Aaron, Pennington initially denied the allegations of sexual misconduct, stating, "I know better not to do anything like that 'cause I'm on—I got ten months of my probation left," and "I did not do a thing like that ... I wouldn't jeopardize my probation." Then, approximately twenty-four minutes after Detective Aaron first began asking about the alleged offense against Child, Pennington said: "Maybe I just touched her once but that was it.... I knew I made a mistake by touching her once with my hand."

Shortly thereafter, Detective Aaron suggested that Pennington write a letter of apology to Mother and Child. Pennington said, "I want to apologize to [Mother] and

---

1. Pennington's signed *Miranda* form, in relevant part, reads as follows:

MIRANDA WARNING
1. You have the right to remain silent.
2. Anything you say can and will be used against you in a court of law.
3. You have the right to talk to a lawyer and have him present with you while you are being questioned if you wish.
4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning if you wish.
5. You can decide at any time to exercise these rights and not answer any questions or make any statements.
6. Each of the above rights has been explained to me and I understand them.
   DATE: 3–14–11 TIME: 4:40
   SIGNED: s/Douglas E. Pennington

[Child] and, so I can go my, my own way and they can go their own way." Detective Aaron replied, "Okay, I'll give you that chance," and handed Pennington a form titled "Voluntary Written Statement." Detective Aaron left Pennington alone in the interview room while Pennington wrote the following letter on the form:

> Dear [Mother] I am sorry for Touching your Dauhter In The private part of her Body and I Like To say That I am very sorry for doing That I Like to Ask for your giviness and I ask the Lord To forgiviness And I hope you can for give me An Let me go on with my Life and you go on with yours Please forgive me.[2]

After Pennington finished writing the letter and Detective Aaron returned to the interview room, Pennington admitted to inserting his finger into Child's vagina "a little bit." Pennington indicated on his hand how far he put his finger into Child's vagina. Pennington confirmed that he asked Child "how she liked it." Pennington also admitted that his penis was erect during the incident and that he tried to get Child to touch his erection, but that Child "pulled her hand away before it got that far." Detective Aaron then ended the interview, the entirety of which lasted approximately one hour and ten minutes.

The State subsequently charged Pennington with one count of first-degree statutory sodomy, under section 566.062, and one count of attempted statutory sodomy, under section 566.062.[3] Count I alleged that Pennington touched Child's genitals with his hand. Count II alleged that Pennington took a substantial step towards the commission of first-degree statutory

sodomy by taking "[Child's] hand and mov[ing] it towards his genitals."

Pennington moved to suppress the oral and written statements he made to Detective Aaron, asserting that he did not knowingly and intelligently waive his *Miranda* rights. At a hearing on the motion, Detective Aaron testified that at no time during the videotaped interview did he get the sense that Pennington did not understand what he was being asked. On cross-examination, Pennington's counsel asked Detective Aaron whether, during the questioning, anything was said about a waiver and whether Pennington was expressly asked if he waived his rights as articulated in the *Miranda* warning. Detective Aaron acknowledged that the *Miranda* form did not mention a waiver of rights or giving up rights. Detective Aaron also acknowledged that he did not ask Pennington whether he was waiving any of his rights, including his right to remain silent. Pennington's counsel argued to the circuit court that it was his "position that under *Miranda* there must be a clear waiver." At the suppression hearing, neither attorney addressed *Berghuis v. Thompkins.*

After the hearing, the circuit court granted Pennington's motion to suppress. In its order, the court noted that the *Miranda* form contained

> no "waiver paragraph," which would state something like "I have read and understand my rights, and with these rights in mind I waive them and willingly make a statement", "I understand each of these rights and having these rights in mind wish to talk", "I understand all of these rights and am willing to talk to you and waive these rights", nor was Defendant Pennington asked by

---

2. Pennington's written statement is transcribed without alteration.

3. All statutory references are to RSMo 2000, as updated through Cum.Supp.2012, unless otherwise noted.

the interrogating detective any of the foregoing.... In his testimony[,] the interrogating detective did not articulate any basis for concluding that Defendant Pennington knowingly waived his Miranda rights and did not ask him if he waived them.

Consequently, the court held that the State failed to establish that Pennington "validly, voluntarily, knowingly, and intelligently waived his Miranda rights." The State now appeals this interlocutory ruling.

## Analysis

■ In its sole point on appeal, the State argues that the circuit court erred in granting Pennington's motion to suppress his oral and written statements to Detective Aaron. Specifically, the State asserts that, in finding that Pennington did not knowingly waive his Miranda rights, the circuit court erroneously applied the law by requiring the State to establish an express waiver. We agree.

■ The issue of whether a defendant validly waived his Miranda rights is one of fact. State v. Sparkling, 363 S.W.3d 46, 51 (Mo.App. W.D.2011). Yet, because the question before this Court is whether the circuit court applied the correct legal stan-dard in determining the waiver issue, we review the circuit court's order de novo. State v. Jones, 384 S.W.3d 357, 363 (Mo. App. S.D.2012).

■ The State bears the burden of proving, by a preponderance of the evidence, that the accused validly waived his Miranda rights.[4] Sparkling, 363 S.W.3d at 49. "The waiver 'inquiry has two distinct dimensions.'" Id. at 50 (quoting Moran v. Burbine, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). "'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" Id. (quoting Moran, 475 U.S. at 421, 106 S.Ct. 1135). "'Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" Id. (quoting Moran, 475 U.S. at 421, 106 S.Ct. 1135). Pennington did not challenge the voluntariness of his waiver and, thus, the only issue before the circuit court was whether he made his uncoerced statements knowingly and intelligently.[5]

■ Although there may be proof that the accused made an uncoerced statement after a Miranda warning was given,

4. Pennington had received a voicemail asking him to contact the police department. In response, he voluntarily went to the police station and met with Detective Aaron. He was never handcuffed or placed under arrest. Because Pennington voluntarily went to the police station and was not in custody at the time of the interview, Detective Aaron's use of the Miranda form may have been an unnecessary, but cautionary, exercise. See State v. Stover, 388 S.W.3d 138, 155 (Mo. banc 2012) (noting that Miranda warnings are required only in situations involving custodial interrogation); State v. Sardeson, 220 S.W.3d 458, 468 (Mo.App. S.D.2007) (finding that suspect was not "in custody" when he voluntarily arrived at the location to speak with officers,

was in an unsecured location, was not restrained, and was free to leave).

5. Although the circuit court found that the State failed to prove that Pennington "knowingly, intelligently, and voluntarily waived" his Miranda rights, Pennington's motion to suppress asserted only that he "did not knowingly and intelligently waive his" rights. Additionally, on appeal, Pennington does not argue that his waiver was involuntary. Rather, Pennington defends the circuit court's decision by contending that "the [S]tate did not prove by a preponderance of the evidence that Mr. Pennington knowingly and intelligently waived his privilege against self-incrimination."

"this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights." *Berghuis*, 130 S.Ct. at 2261 (quoting *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602). However, the State "does not need to show that a waiver of *Miranda* rights was express." *Id.* "[W]aivers can be established even absent formal or express statements of waiver...." *Id.*[6] Nevertheless, the language in the circuit court's suppression order suggests that it improperly based its decision on the absence of an express waiver.

In finding that the State did not present *any* evidence of a valid waiver, the circuit court repeatedly emphasized the absence of an express waiver:

> [Detective Aaron] testified that the Defendant never said he was giving up his Miranda rights and that he, the detective, never asked, and that the detective testified that neither the Defendant nor the detective used the term "waiver" with regard to Defendant's Miranda rights.
>
> ....
>
> ... The Court notes that on the Miranda Warning form used by the Riverside Department of Public Safety there is no "waiver paragraph" which would state something like "I have read and understand my rights, and with these rights in mind I waive them and willingly make a statement", "I understand

each of these rights and having these rights in mind wish to talk", "I understand all of these rights and am willing to talk to you and waive these rights", nor was Defendant Pennington asked by the interrogating detective any of the foregoing.

This focus on the lack of a specific statement of waiver strongly indicates that the circuit court improperly required the State to prove that Pennington's waiver was express.

■ An accused's uncoerced statement after being given a *Miranda* warning establishes an implied waiver where the prosecution makes an additional showing that the accused *understood* the *Miranda* warning. *Sparkling*, 363 S.W.3d at 50.[7] In the instant case, there is evidence in the record to indicate that Pennington understood the rights described in the *Miranda* form. Detective Aaron provided Pennington with the *Miranda* form, and Pennington read each of the warnings aloud. *See Berghuis*, 130 S.Ct. at 2262 (finding the fact that defendant read part of the *Miranda* form aloud supported the conclusion that he understood his *Miranda* rights). Here, the last sentence of the *Miranda* form stated: "Each of the above rights has been explained to me and *I understand them.*" (Emphasis added.) Detective Aaron asked Pennington twice if he understood the rights he had just read aloud, and both times Pennington answered affir-

---

6. We note, however, while not mandated, the inclusion of waiver language in the *Miranda* form would have avoided the issue faced in this case.

7. In *Sparkling*, the court used the phrase, *"fully understood,"* in reference to what the State was required to prove to demonstrate compliance with *Miranda*. *Sparkling*, 363 S.W.3d at 50. Both Pennington and the dissent latch onto the word, *"fully,"* as requiring the State to demonstrate that Pennington not only understood his rights but also fully appreciated all of the ramifications of providing

a statement (i.e., that it might not be in his best interest). Reading *Sparkling* this broadly is contrary to United States Supreme Court precedent. *See Moran v. Burbine*, 475 U.S. 412, 422, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) ("[W]e have never read the Constitution to require that the police supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights."). Thus, we reject this overly broad interpretation of *Sparkling*.

matively. Detective Aaron even told Pennington that his signature would further confirm that he understood his rights, and Pennington signed the *Miranda* form.

■ "A waiver is generally knowing and intelligent if the defendant understood the warnings—if the defendant knew he could remain silent, could request an attorney be present during the interrogation, and that the State could and would use any statement to obtain a conviction." *State v. Mateo*, 335 S.W.3d 529, 537 (Mo.App. W.D. 2011) (finding that the State proved that the defendant understood his *Miranda* rights and knowingly and voluntarily waived them where the evidence demonstrated that the defendant was advised of his rights in accordance with *Miranda*, was able to read the rights to himself and repeat them aloud, and was able to ask questions about his rights).

Here, despite the fact that evidence was introduced at the suppression hearing demonstrating that Pennington was aware of and understood his rights, the circuit court's order suppressing Pennington's confession stated that "[t]here was *no evidence nor testimony* presented at the hearing herein that indicated that Defendant Pennington knowingly, intelligently, and voluntarily waived his [*Miranda* rights]...." (Emphasis added.) Further, the circuit court noted that, "[i]n his testimony [Detective Aaron] did not articulate *any basis* for concluding that Defendant Pennington knowingly waived his Miranda rights...." (Emphasis added.)

■ The dissent argues that the circuit court found a lack of not only an express but also an implied waiver. We disagree. In making this argument, the dissent implies that the circuit court simply disbelieved the evidence supporting an implicit waiver, in part because Pennington was not advised, initially, that he was going to be questioned as a suspect regarding the alleged sexual misconduct. But there are three flaws in this logic. First, the fact that the investigating officers did not advise Pennington of the purpose of the interview has no effect on the knowing nature of his subsequent waiver. *See Colorado v. Spring*, 479 U.S. 564, 576–77, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) (holding that "the failure of the law enforcement officials to inform [the defendant] of the subject matter of the interrogation could not affect [his] decision to waive his Fifth Amendment privilege in a constitutionally significant manner").

■ The second flaw in the dissent's argument is that a "waiver can be clearly inferred from the actions and words of the person interrogated." *N.C. v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). "The requirement that a waiver of rights be knowing and intelligent does not mean that a defendant must know and understand all of the possible consequences of the waiver." *State v. Powell*, 798 S.W.2d 709, 713 (Mo. banc 1990).

> Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid *as a matter of law.*

*Moran*, 475 U.S. at 422–23, 106 S.Ct. 1135 (emphasis added). Here, there is no claim that Pennington's decision to waive his rights was coerced, and after he indicated four times that he *understood* his rights, Pennington chose to make a statement. As a matter of law, the facts of the interview would be sufficient to establish an implicit waiver. Yet, the circuit court concluded that there was "no evidence" of a knowing, intelligent, and voluntary waiver.

The final flaw in the dissent's argument is that the circuit court made no findings related to credibility. Rather than finding that the evidence was not credible, the circuit court's order finds that there was "*no evidence nor testimony* presented at the hearing herein that indicated that Defendant Pennington knowingly, intelligently, and voluntarily waived" his *Miranda* rights and that the detective's testimony "did not articulate *any basis* for concluding that Defendant Pennington knowingly waived his Miranda rights. . . ." (Emphasis added.) These broad statements, which, as noted, *supra,* are inconsistent with the record, reflect that the circuit court applied the wrong legal standard—not that the circuit court found the State's evidence lacked credibility.

Accordingly, because the circuit court applied the incorrect legal standard in its consideration of whether Pennington knowingly and intelligently waived his *Miranda* rights, we reverse and remand the suppression order for reconsideration.

### Conclusion

The circuit court's suppression order is reversed, and the cause is remanded for further consideration consistent with this opinion.

THOMAS H. NEWTON, Judge, concurs.

LISA WHITE HARDWICK, Judge, dissents in separate opinion.

LISA WHITE HARDWICK, Judge.

I respectfully dissent from the majority's conclusion that the circuit court applied the incorrect legal standard in determining whether Douglas Pennington knowingly and intelligently waived his *Miranda* rights. The record indicates that the circuit court initially considered whether there was an explicit waiver of rights, but it ultimately considered whether there was *any* evidence to establish an implicit waiver. I would affirm the suppression order because the record supports the circuit court's determination that the State failed to meet its burden of proving that Pennington understood the nature and consequences of the *Miranda* form he signed.

In its sole point on appeal, the State contends the circuit court erred in granting the motion to suppress because a suspect who has been advised of his *Miranda* rights can be presumed to have waived those rights, even without an explicit waiver. The State contends the evidence was sufficient to establish that Pennington implicitly waived his rights because he read the *Miranda* form and told Detective Aaron that he understood it.

Our review of an order sustaining a motion to suppress is limited to a determination of whether the trial court's ruling is supported by substantial evidence. *State v. Sparkling,* 363 S.W.3d 46, 49 (Mo.App. 2011). We will reverse the suppression order only upon a finding that it is clearly erroneous and leaves us with a definite and firm impression that a mistake has been made. *Id.* We must consider the evidence in a light most favorable to the ruling and disregard all contrary evidence and inferences. *Id.*

This standard of review requires us to defer to the trial court's factual findings and credibility determinations, but to examine questions of law *de novo. State v. Werner,* 9 S.W.3d 590, 595 (Mo. banc 2000). The issue of whether a defendant waived his *Miranda* rights is a question of fact. *Sparkling,* 363 S.W.3d at 51. "On review, 'courts indulge every reasonable presumption against waiver of fundamental constitutional rights.' " *Id.* at 50 (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). Such

waivers must not only be voluntary, but must "constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981) (quoting *Zerbst*, 304 U.S. at 464, 58 S.Ct. 1019).

The State had the burden of proving, by a preponderance of the evidence, that Pennington validly waived his *Miranda* rights. *Sparkling*, 363 S.W.3d at 49. "The waiver inquiry 'has two distinct dimensions.'" *Id.* at 50 (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)). "'First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *Id.* (quoting *Burbine*, 475 U.S. at 421, 106 S.Ct. 1135). Second, the waiver must have been made knowingly in the sense that it was "'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id.* (quoting *Burbine*, 475 U.S. at 421, 106 S.Ct. 1135). Because Pennington did not challenge the voluntariness of his waiver, the only issue before the circuit court was whether he made his uncoerced statements knowingly and intelligently.

The circuit court found that the State failed to establish that Pennington knowingly and intelligently waived his *Miranda* rights. Based on evidence presented at the suppression hearing, the court found that Pennington never said he was giving up his rights and the *Miranda* form that he signed did not include any language regarding a waiver. The court also noted that Detective Aaron asked Pennington whether he understood the *Miranda* form,

but Detective Aaron never asked whether Pennington was willing to give up his rights referenced on the form. In the absence of a clear waiver, the court also carefully considered Detective Aaron's testimony in determining whether there was any plausible reason to believe that Pennington understood the implications of the form he signed. This evidence supports the court's ultimate finding that "the interrogating detective did not articulate any basis for concluding that Defendant Pennington waived his Miranda rights *and* did not ask if him if he waived them." (Emphasis added).

Citing *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010), the State argues that there is a presumption of waiver if a suspect has been advised of his *Miranda* rights, indicates his understanding of those rights, and gives an uncoerced statement. In *Berghuis*, the U.S. Supreme Court recognized that "waivers can be established even absent formal or express statements of waiver." *Id.* at 2261. The Court cautioned, however, that a mere showing of a suspect's uncoerced statement after being given a *Miranda* warning is "insufficient to demonstrate 'a valid waiver' of *Miranda* rights." *Id.* (quoting *Miranda*, 384 U.S. at 475, 86 S.Ct. 1602). To establish an implied waiver, "[t]he prosecution must make the additional showing that the suspect *understood* those rights." *Id.* (emphasis added).

There is no presumption that a person who signs a *Miranda* warning necessarily understands that he is waiving rights. The validity of any alleged waiver is an issue of fact for the trial court to determine. *Sparkling*, 363 S.W.3d at 51. "Only where the prosecution shows that a *Miranda* warning was given and it was *fully understood* by the accused, does an accused's uncoerced statement establish an

implied waiver of the right to remain silent." *Id.* at 50.

Here, the State failed to demonstrate that Pennington signed the *Miranda* form with "a full awareness of both the nature of the right being abandoned and the consequences of [his] decision to abandon it." *Id.* Viewed in a light most favorable to the trial court's ruling, the record indicates that Detective Aaron sought to minimize the impact of the *Miranda* warning during his videotaped interview with Pennington. Prior to the interview, Pennington had received a voicemail asking him to contact the police department. He voluntarily went to the police station and met with Detective Aaron. The initial conversation between Pennington and Detective Aaron focused exclusively on a police report that Pennington had recently filed after being assaulted by his neighbor. Detective Aaron complimented Pennington on providing "good information" to the police department and then assured him that the police were there to protect his rights. As part of that protection, Detective Aaron further told Pennington that there was "some paperwork we go through so we can visit." Detective Aaron then presented the *Miranda* form, which Pennington read and signed. The context of the conversation renders it unclear as to whether Pennington fully understood that he was being asked to waive rights as a criminal suspect or invoke protections as a complainant. In light of this record, the circuit court reasonably concluded that Detective Aaron "did not articulate any basis for concluding that Defendant Pennington knowingly waived his *Miranda* rights."

The majority opinion arrives at the conclusion that the circuit court applied the incorrect legal standard even though the judgment does not discuss the applicable law. Generally, we must "presume the trial court knew and followed the law un-

less its judgment clearly indicates otherwise." *In re Marriage of Davis,* 378 S.W.3d 426, 432 n. 4 (Mo.App.2012). More to the point, even when the court is silent as to the specific legal standard applied, we must assume the court knew and applied the correct standard. *Switzer v. Hart,* 957 S.W.2d 512, 514 (Mo.App.1997). Here, while the judgment does not include citations to *Berghuis, Sparkling* or other cases addressing the propriety of implicit waivers, the court's ultimate findings indicate that it understood and applied that standard. Rather than a misapplication of law, the judgment reflects the court's determination that the State simply failed to meet its burden of proving that Pennington knowingly and intelligently relinquished his *Miranda* rights, whether by express or implied waiver. I, therefore, dissent from the majority opinion and would affirm the suppression order.