

# In the Missouri Court of Appeals
# Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED108566 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | St. Louis County |
| vs. | ) | 17SL-CR07071-01 |
| | ) | |
| JOSHUA WATKINS, | ) | Honorable Richard M. Stewart |
| | ) | |
| Appellant. | ) | Filed: March 2, 2021 |

Angela T. Quigless, P.J., Kurt S. Odenwald, J., and James M. Dowd, J.

## Introduction

Joshua Watkins appeals the judgment entered after he was found guilty by a jury in the Circuit Court of St. Louis County of two counts of first degree assault, two counts of armed criminal action, and one count of the unlawful use of a weapon for which he was sentenced to twenty-five years in prison. These charges arose from an August, 2018 incident in Kirkwood, Missouri in which Watkins shot two victims leaving both severely injured. On appeal, Watkins argues that the trial court erred in denying his motion to suppress certain incriminating statements he made during a custodial interview on the night of the shootings because his Miranda rights' waiver was not knowing and intelligent. He further asserts that he was prejudiced by this error because without these incriminating statements in evidence, there is a reasonable probability that the outcome of the trial would have been different since the remaining evidence against him was not overwhelming.

Finding no clear error, we affirm.

## Background

On the evening of August 22, 2018, outside his Kirkwood, Missouri home, Watkins and his friends Aleah Poe and Terrell Cunningham, the two victims here, were socializing. All three had taken the prescription drug Xanax and Watkins also reportedly consumed alcohol and cocaine. At some point, Cunningham got possession of Watkins' firearm and proceeded to nearby railroad tracks where he fired several rounds into the air. When Cunningham returned, Watkins became angry and accused Cunningham of stealing the weapon from him though Cunningham claimed Watkins had allowed him to borrow it. Watkins struck Cunningham, a struggle over the weapon ensued, and it discharged. Watkins then got control of the gun and shot Cunningham three times while he lay on the ground. Poe ran to her vehicle and got in the passenger seat. Watkins approached the car and fired three shots at Poe through the windshield hitting her in the face.

Kirkwood Police, who were nearby investigating the earlier gunshots, arrived almost immediately on the scene. They found Poe and Cunningham lying in the street, bloody, and in need of urgent medical attention. Police body camera footage from the scene captured both Poe and Cunningham pointing toward Watkins and screaming that he had shot them while Watkins appeared to be walking away from the scene. Watkins was placed under arrest and a K-9 unit later recovered his firearm in between two houses near the crime scene.

Poe and Cunningham were transported to the hospital where they underwent extensive emergency surgeries. Cunningham had a metal rod placed inside his femur and Poe lost her left eye. Both victims told police the following day that Watkins had shot them after he became upset that Cunningham had shot his gun, and further that Watkins had voluntarily taken multiple intoxicating substances prior to the shooting.

Watkins was taken to the Kirkwood police station and allowed to sleep. After he slept for several hours, police brought Watkins back into an interrogation room, presented to him a

2

Miranda waiver form, and proceeded to read him his Miranda rights. Watkins' initials appear next to each Miranda right set forth on the waiver form. He wrote "yes" and initialed next to the question "Do you understand each of these rights I have explained to you?" and then he signed his name before he began speaking with the officers about the shootings.

Watkins initially stated that he did not remember what happened the night before. A detective noted that Watkins appeared "out of it" and offered to let him go back to sleep. Watkins insisted he was not "out of it" and wanted to tell the officers what happened. Watkins asked multiple times if the officers were writing down what he said and if the interview was being recorded. Watkins admitted that he voluntarily took Xanax and that he shot Cunningham because he was upset that Cunningham had used his gun. As for Poe, Watkins initially stated he did not remember shooting her, but later admitted he stood in front of the car and shot her through the windshield.

At the crime scene, detectives recovered seven shell casings. A ballistic lab analysis showed that all seven casings came from the firearm recovered at the scene, which was registered to Watkins. A gunshot residue test performed on Watkins' hands was positive, indicating he had recently discharged a firearm.

When Poe awoke from surgery, she told Detective Beckman that she saw Watkins consume cocaine and that she had given him Xanax. Poe said she left Watkins' house before the shootings to get cigarettes and when she returned, she saw Cunningham holding Watkins' gun. She observed that Watkins was angry that Cunningham had shot the gun and failed to retrieve all the shell casings. She then witnessed Watkins knock Cunningham down and shoot him as he lay on the ground.

For his part, Cunningham told Detective Beckman that Watkins struck him and then shot him because he was angry that Cunningham shot his gun. Cunningham said that Watkins was

3

the only person he saw with a gun that night and that Watkins probably shot him because he was intoxicated.

At trial, the jury heard the recorded statements each victim gave Detective Beckman at the hospital the day after the shootings in which each victim identified Watkins as the shooter. Both victims confirmed the voices on the recording of their statements to Detective Beckman were theirs. The victims' trial testimony differed from their recorded statements as both told the jury they could neither remember Watkins shooting them nor giving statements to Detective Beckman the following day. Both denied they consumed drugs, denied they offered drugs to Watkins, and denied they observed Watkins use drugs.

**Standard of Review**

A trial court's ruling on a motion to suppress evidence at trial will be affirmed unless it is clearly erroneous. *State v. Bates*, 464 S.W.3d 257, 262 (Mo. App. E.D. 2015). A ruling is considered clearly erroneous when, although there is evidence to support it, the reviewing court is left with the definite and firm conviction that a mistake has been made. *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 565 (1985).

When reviewing the denial of a motion to suppress, this Court considers the evidence presented at both the suppression hearing and at trial to determine whether there is sufficient evidence in the record to support the ruling. *State v. Pike*, 162 S.W.3d 464, 472 (Mo. banc 2005). The evidence is viewed in the light most favorable to the trial court's ruling, and this Court defers to the trial court's credibility determinations. *State v. Collings*, 450 S.W.3d 741, 753 (Mo. banc 2014).

When the admissibility of a defendant's statement has been challenged, the State bears the burden of demonstrating by a preponderance of the evidence that the defendant voluntarily, knowingly and intelligently made the statement. *State v. Bucklew*, 973 S.W.2d 83, 87 (Mo. banc 1998). To determine whether Watkins' waiver of his Miranda rights was voluntary, knowing,

4

and intelligent and thus valid, we consider "the totality of the circumstances." *U.S. v. Figueroa-Serrano*, 971 F.3d 806, 814 (8th Cir. 2020) (quoting *United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011)). This inquiry depends on the facts and circumstances surrounding the case, including "the background, experience, and conduct of the accused," *Edwards v. Arizona*, 451 U.S. 477, 482 (1981), and such an inquiry is "an examination that was designed for a trial judge." *Schneckloth v. Bustamonte,* 412 U.S. 218, 244 (1973).

### Discussion

The lone issue before us is whether Watkins voluntarily, knowingly, and intelligently waived his Miranda rights under a totality-of-the-circumstances analysis such that the incriminating statements he made during his custodial interview were properly admitted at trial.

**I.      Watkins' Miranda-rights waiver was knowing and intelligent.**

A knowing and intelligent waiver is "normally shown by having a police officer testify that he read the accused his rights, asked whether the rights were understood, and received an affirmative response." *State v. Wise*, 879 S.W.2d 494, 505 (Mo. banc 1994). "The knowing and intelligent requirement does not mean that a defendant must know and understand all the possible consequences of the waiver." *State v. Powell*, 798 S.W.2d 709, 713 (Mo. banc 1990) (quoting *Moran v. Burbine*, 475 U.S. 412, 422 (1986)).

**A.      The totality-of-the-circumstances analysis.**

Here, the totality of the circumstances surrounding Watkins' waiver, including the video recording of the custodial interview and Detective Beckman's trial testimony, establish that Watkins knowingly and intelligently waived his Miranda rights. There is no indication or allegation of coercion or intimidation by the detectives. Likewise, there is no indication from the record and no assertion by Watkins that he was unable to read or understand spoken English.

Watkins asserts that the unintelligible noises he made in response to some of the detective's Miranda statements cannot satisfy the standard for a knowing and intelligent waiver.

5

We disagree. The detective, in the first instance, is in the best position to gauge the defendant's comprehension and communication. And in this case, Detective Beckman testified that Watkins was tracking his Miranda recitation with verbal utterances and non-verbal responses and with the placement of his initials at the appropriate time and in the appropriate spot such that the detective concluded that Watkins understood.

The record shows that Detective Beckman received a verbal affirmation of "yes" to the recitation of the first Miranda right, then Watkins responded to the detective's succeeding recitation of each Miranda right with grunts and other nonverbal gestures which Detective Beckman interpreted as affirmative. This conduct, along with Watkins' signature on the waiver form and his initials after each listed Miranda right, demonstrates a strong pattern of affirmative responses from which a reasonable person could infer that Watkins knowingly and intelligently waived his Miranda rights. *State v. Pennington*, 408 S.W.3d 780, 785–86 (Mo. App. W.D. 2013).

Moreover, Watkins insisted on speaking with the detectives. He showed no desire to remain silent and never expressed his desire to have counsel present while speaking to the detectives. Rather, he appeared eager to tell his story and to ensure that the detectives recorded it. This pattern of conduct further demonstrates that Watkins knowingly and intelligently waived his Miranda rights under the totality of the circumstances.

Watkins relies on *State v. Sparkling* in which the trial court found that the defendant did not knowingly and intelligently waive the Miranda rights. 363 S.W.3d 46 (Mo. App. W.D. 2011). We find *Sparkling* distinguishable. In *Sparkling*, unlike here, the defendant gave no verbal or nonverbal response whatsoever to the officer's Miranda questions and the defendant did not initial on the waiver form. *Id.*

**B. Overwhelming evidence of guilt.**

Even if we were to find that his Miranda-rights waiver was not knowing and intelligent such that his custodial interview statements should have been suppressed, the outcome of the trial would not have been affected because the overwhelming weight of the remaining evidence demonstrated Watkins' guilt on all five counts. *State v. Barriner*, 34 S.W.3d 139, 150 (Mo. banc 2000). Both victims unequivocally named Watkins as the shooter within minutes of the shooting and did so again the next day in recorded interviews with the detective. Also, the forensic evidence from the scene tied Watkins to the weapon and showed he had recently shot a gun. Frankly, Watkins' incriminating statements were in large measure cumulative to this overwhelming evidence of his guilt.

**C. The issue of Watkins' intoxication.**

At oral argument, counsel for Watkins' introduced the notion that Watkins may have been *involuntarily* intoxicated. This issue was not raised in Watkins' brief and is therefore unpreserved. *State v. Pierce*, 433 S.W.3d 424, 428 (Mo. banc 2014). Even if the issue had been preserved, it is wholly without merit factually and legally.

Missouri law is clear that a defendant can validly waive his Miranda rights even if he has a deficient mental condition caused by intoxication. *State v. Armstrong*, 72 S.W.3d 327, 331 (Mo. App. S.D. 2002). Unless the intoxication is so severe as to "rise[s] to a mania," intoxication at the time of a confession does not by itself make that confession unknowing or unintelligent. *Id*. There is no indication in this record that, at the time he waived his Miranda rights and made the incriminating statements, Watkins remained under the influence of intoxicating substances. The detectives allowed him to sleep after his arrest and he appeared to them to be sufficiently clear-headed.

There is also no indication that Watkins was a victim of involuntary intoxication. In his custodial interview, Watkins admitted that he voluntarily consumed Xanax. This was

7

corroborated by Poe in her statement to Detective Beckman at the hospital. She also stated that she observed Watkins voluntarily consume alcohol and cocaine. Neither Watkins nor any of the victims or witnesses provided any probative evidence suggesting he was involuntarily intoxicated.

Regardless, whether Watkins' mental state had any effect on his waiver is a determination that the trial court had the superior ability to make. *State v. Lytle*, 715 S.W.2d 910, 915 (Mo. banc 1986). We defer to the trial court's determinations regarding credibility and we find the record supports the trial court's denial of Watkins' motion to suppress. *Id.*

## Conclusion

For the reasons set forth above, we affirm the judgment of the trial court.

                        _____

James M. Dowd, Judge

Angela T. Quigless, P.J., and
Kurt S. Odenwald, J., concur.