

# In the Missouri Court of Appeals
# Eastern District

### DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED101654 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| v. | ) | |
| | ) | |
| DAARON HARRIS, | ) | Honorable Michael K. Mullen |
| | ) | |
| Defendant/Appellant. | ) | Filed: September 22, 2015 |

## Introduction

Daaron Harris (Appellant) appeals from the trial court's judgment entered upon a jury verdict finding him guilty of one count of murder in the first degree, one count of burglary, and two counts of armed criminal action. We affirm.

## Factual and Procedural Background

The State charged Appellant, as a prior and persistent offender, with one count of first-degree murder, one count of burglary, and two counts of armed criminal action. Appellant does not contest the sufficiency of the evidence supporting his conviction. The evidence, viewed in the light most favorable to the verdict, is as follows.

On August 29, 2011, Deon Greenwood (Victim) was at the apartment of his girlfriend, Destiny Harris (Harris), along with several of Harris's family members. They were watching television when they heard a loud noise coming from downstairs. Victim, who was unarmed, went downstairs to investigate. The upstairs occupants heard three or

four gunshots, then ran and hid in the closets. When the shooting stopped, Harris looked out the window and saw two men walking away, one of whom was holding a "long gun."

The rear door to the apartment was bent and appeared to have been forced open. Based on the cartridge casings and shotgun pellets recovered, the firearms examiner believed three different guns were used in the attack. An autopsy revealed Victim died of multiple gunshot wounds.

Over the course of the next several months, St. Louis Metropolitan Police identified Appellant as a possible suspect and a wanted was issued for Appellant on March 26, 2012.

On April 21, 2012, Appellant took his father to the hospital. Appellant left after an altercation with hospital security. Shortly thereafter, at approximately 3:00 or 4:00 p.m., Appellant was pulled over and arrested by police on another matter. Appellant testified he was able to hide crack cocaine, marijuana, and a bottle of Percocet on his body before being arrested. Appellant was handcuffed behind his back and was placed in a police transport vehicle.

Appellant testified that while in transport, he called his mother and learned that his father had died. Appellant testified he took multiple Percocet pills in an attempt to commit suicide. Appellant stated he took the rest of the Percocet and smoked the marijuana while at the Justice Center, but the crack cocaine had been taken from him. Appellant testified he had taken a total of 30 Percocets between the time of his arrest and his interview with police, and that he had fallen asleep after taking the remaining pills at the Justice Center the night before the interview.

2

On April 22, 2012, Detective Steven Strohmeyer (Det. Strohmeyer) learned that Appellant had been taken into custody and was at the Justice Center. That morning, Det. Strohmeyer and Det. Heather Sabin (Det. Sabin) picked up Appellant from the Justice Center and transported him across the street to police headquarters to interview him. The detectives did not talk to Appellant during transport or in the interview room other than the time their conversation was recorded. Det. Strohmeyer read Appellant his Miranda[1] rights and Appellant indicated he understood his rights. Det. Strohmeyer presented Appellant with a police department Miranda warning and waiver form and advised Appellant of the form's contents. Appellant signed the warning and waiver form.

Det. Strohmeyer testified that at the beginning of the interview Appellant was crying and upset about his father but he regained his composure and was able to answer the questions. Det. Strohmeyer testified Appellant seemed to understand the questions being asked. Det. Strohmeyer did not know if Appellant had eaten any meals or slept while at the Justice Center, but Appellant did bring a juice with him to the interview. Det. Strohmeyer testified he did not ask Appellant if he had taken any drugs before the interview because Appellant admitted using cigarettes and marijuana but denied having a drug problem. Det. Strohmeyer testified Appellant did not ask for a break during the interview but he would have given Appellant one if requested.

Appellant testified at trial in his defense. Appellant admitted to having two prior felony convictions for possession of a controlled substance, specifically crack cocaine, and two misdemeanor marijuana possession cases. Appellant asserted he had not been fed anything between his arrest on April 21 and the interview with the detectives on April

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602 (1966).

22. Appellant stated he was depressed about his father's death and had not been able to talk to his family.

Appellant testified he told Det. Strohmeyer while in the car being transported to the interview that he did not want to talk to the detectives and that he wanted an attorney. Appellant testified the detectives threatened to charge his brothers with the murder if Appellant did not cooperate with the police and told Appellant they would release him after he confessed.

Appellant told the detectives he had been threatened by a man named Darrell Scott (Scott) and had hidden a rifle in a nearby gangway. On the day of the murder, an argument broke out between Appellant, Scott, and several other men. One person pulled a gun and fired at Appellant, who ducked. Appellant said the shooter and two other men, including Victim, ran into the apartment building. Appellant stated he followed the men into the building and fired about two shots.

Appellant acknowledged Det. Strohmeyer read him his rights before the interview but stated he was not thinking clearly during the interview because of the drugs he had taken. Appellant asserted he confessed to the murder to protect his brothers and because he thought the police would release him. Appellant testified he made up the entire confession and denied owning a gun or shooting Victim.

In rebuttal, Det. Sabin denied threatening Appellant's brothers and denied Appellant requested an attorney or told the detectives he did not want to talk with them.

After deliberations, the jury found Appellant guilty on all counts. On June 20, 2014, the trial court sentenced Appellant to life without the possibility of parole on the murder conviction, a consecutive 30-year term for the burglary conviction, and two

4

concurrent 30-year terms for the armed criminal action convictions. This appeal follows. Appellant raises six points on appeal.

## Discussion

### Point I – Court Inquiry of Juror 1975 and Request for a Mistrial

Jury deliberations began at 2:10 p.m. on April 30, 2014. The jury asked several questions, including whether they would be expected to stay that evening until they reached a verdict. The court advised the jury they would not be expected to deliberate beyond 5:00 p.m. and they could deliberate further in the morning. At 5:05 p.m., the court adjourned for the evening. Deliberations resumed the following day at 9:10 a.m. At 10:15 a.m., the court received a message from the foreperson stating, "We have a Juror, No. 1975, who would like to talk to the [J]udge. She is nervous and scared about participating in the verdict." Defense counsel objected to the court speaking with the juror and requested a mistrial. The court determined it needed to talk to the juror and brought her into open court with the attorneys present.

> THE COURT: Hi, [Juror 1975]. I got a note from the foreperson. The note says, We have a juror -- and it indicates your badge number -- who would like to talk to the judge. She is nervous and scared about participating in the verdict.
> So I haven't had that happen honestly, it's kind of an unorthodox request. But I certainly -- my first thought was I needed to talk you, kind of, to see what's going on, if you agree with this question since it wasn't in your handwriting. So is there something that you –
> JUROR NO. 1975: Well, me personally I do not -- beyond a reasonable doubt I don't believe it happened. And I know what everybody upstairs is leaning towards, and my feelings are totally different from that.
> And I just -- listening to that DVD again, I heard him say that his mother stays on the west side, and the detective says, "What, off of Goodfellow?" [].
> Like, I don't want to come down here and say that he's guilty, and all of them people in here and somebody see me at home. Like I'm uncomfortable. Because to me -- and it says beyond a reasonable doubt, it

5

has not been proven to me. And I don't know how this works. So I was just like maybe if I come find out, I don't know. I don't know what to do.

THE COURT: Okay. I'm just going -- all I can really do with that is tell you to be guided by the instructions that I gave you. There [are] instructions in there that talk about that you need to reach a verdict, your own verdict, it has to be unanimous, but each juror is to reach his or her own verdict. So you should do that only after you listen to the views of your other jurors, but it still has to be your verdict in the end.

So I'm not telling you come to a decision on something you don't believe.

JUROR NO. 1975: Okay.

THE COURT: So it's up to you to come to a decision.

JUROR NO. 1975: See, and that's what I'm thinking that I have to do, I have to.

THE COURT: No.

On the flip side of that, though, there is also an instruction that says you should reach your decision not based on fear, you know, that's in the instructions as well. So that's your duty. But your duty is to follow those instructions.

And I think if you read the instructions, every issue you brought to me is sort of addressed in the instructions. Okay.

JUROR NO. 1975: Okay.

THE COURT: I guess -- but nothing happened in between like last night –

JUROR NO. 1975: No.

THE COURT: Okay. That's what I was also kind of concerned about. Okay. Very good then.

I'm going to ask you to go back up and continue deliberations.

JUROR NO. 1975: Okay.

Juror 1975 returned to the jury room and deliberations continued. At 11:45 a.m., the jury asked if the court was providing lunch and if they could use their cellular phones over the lunch break. Defense counsel objected to the court ordering lunch or allowing the jury to use their phones over the break and moved for a mistrial based on the court's earlier discussion with Juror 1975. The court provided the jurors lunch and use of their phones. At 2:05 p.m., the jury returned its verdict. The court accepted the verdict after the jury was polled.

6

On appeal, Appellant argues the trial court abused its discretion in denying his objection and request for a mistrial because the court improperly questioned Juror 1975 and instructed her to continue deliberating despite knowing she had made a decision contrary to the majority of the other jurors, thereby compelling Juror 1975 to return guilty verdicts against him.

A mistrial is a drastic remedy to be exercised only in those extraordinary circumstances in which the prejudice to the defendant cannot otherwise be removed. State v. Ward, 242 S.W.3d 698, 704 (Mo. banc 2008). The trial court is in the best position to determine whether an incident had prejudicial effect on the jury, so the decision whether to grant or deny a mistrial is left to the trial court's discretion. Id. We review the trial court's decision for an abuse of discretion. Id. A trial court abuses its discretion when its ruling is clearly against the logic of the circumstances before it and when the ruling is so arbitrary and unreasonable as to shock one's sense of justice and indicates a lack of careful consideration. Id.

First, Appellant suggests the trial court erred in that it "singled out and questioned [Juror 1975] about being nervous and scared about participating in the verdict." In support, Appellant relies on the "general rule [] that no communication whatever should take place between the Court and the jury, after the cause has been submitted to them, unless in open court, and where practicable, in the presence of the attorneys in said cause." Boedges v. Dinges, 428 S.W.2d 930, 934 (Mo. App. E.D. 1968). This argument is completely without merit because the court's examination of Juror 1975 was done in open court and in the presence of the attorneys, thus complying with the general rule.

Appellant next argues the trial court's examination of Juror 1975 resulted in a coerced verdict. Appellant asserts Juror 1975 "unequivocally" stated she did not believe the State proved his guilt beyond a reasonable doubt and Juror 1975 was placed in a position of disagreeing with other jurors who had already decided they were in favor of a guilty verdict. Appellant contends "further questioning and insistence" that Juror 1975 continue to deliberate was coercive and the court's only option was to declare a mistrial.

A coerced verdict does not represent the jury's true unanimous concurrence. State v. Dodd, 10 S.W.3d 546, 552 (Mo. App. W.D. 1999). "A reviewing court must distinguish between a trial court's effort to eliminate confusion and its attempt to compel a juror to change his vote or to coerce a unanimous verdict." Id. A verdict is considered coerced when under the totality of the circumstances it appears the trial court virtually directed that a verdict be reached and by implication indicated it would hold the jury until a verdict was reached. State v. Burton, 219 S.W.3d 778, 782 (Mo. App. E.D. 2007).

While Juror 1975 initially stated she did not "believe it happened," she also stated she was uncomfortable rendering a guilty verdict because she lived near Appellant's mother and was concerned "somebody" would see her at home. This suggests Juror 1975 was being influenced by fear in rendering her verdict, which is improper.

Contrary to Appellant's assertions, it was not clear from the exchange that the jury was split 11-1 in favor of a guilty verdict, in that Juror 1975 stated only that "I know what everybody upstairs is *leaning* towards, and my feelings are totally different from that." (Emphasis added.) This is not an absolute statement of the jury's split but instead indicates the jurors were still discussing and deliberating the case.

The trial court properly investigated the cause of Juror 1975's fear, ensuring nothing had occurred overnight to cause such, and then specifically advised Juror 1975 to be guided by the instructions, to not make a decision based on fear, and to listen to the views of the other jurors but to come to her own decision on what she believed. The court specifically told Juror 1975 that it was not telling her to come to a particular decision or make a decision she did not believe in.

Juror 1975 then returned to the jury room to deliberate with the other jurors in accordance with the instructions. Appellant did not object when the court released Juror 1975 to continue deliberations. At this point, the jury had been deliberating only four hours and the trial court did not give the hammer instruction. The jury then deliberated approximately three additional hours before returning a verdict.

The record does not support a finding that the trial court coerced the jury verdict by instructing Juror 1975 to be guided by the instructions during deliberations. Based on the foregoing, Appellant's Point I is denied.

Point II − Motion to Suppress Statements

Appellant filed a pretrial motion to suppress statements to police. The court conducted a hearing on the motion on April 21, 2014, at which the following evidence was adduced.

Det. Strohmeyer testified he read Appellant his Miranda rights prior to the interview, Appellant signed a warning and waiver form, and Appellant did not request an attorney. Strohmeyer testified Appellant was sobbing at the beginning of the interview but composed himself and was able to talk to the detectives. Appellant seemed to understand the questions being asked and did not seem to be under the influence of

9

anything. Strohmeyer stated Appellant brought a drink with him to the interview and declined their offer of something to eat or drink. Strohmeyer testified he did not make any threats or promises to Appellant in order to force him to answer any questions, including that they would charge Appellant's brothers with the murder if Appellant did not cooperate or that Appellant would be released if he did cooperate. Strohmeyer testified the interview lasted a little over two hours and denied having any off-camera discussions with Appellant about the murder.

At the hearing, Appellant testified he was currently 27 years old and his father had passed away the day before the interview. Appellant stated he had driven his father to the hospital and was arrested 10 minutes after dropping him off. Appellant asserted the detectives questioned him about the murder while driving him from the Justice Center and he told the detectives he wanted an attorney. Appellant testified the detectives threatened to charge his brothers with the murder if he did not cooperate and told him they would allow him to leave to be with his family if he did cooperate.

Appellant testified he had neither slept nor eaten anything since being arrested the day before the interview. Appellant testified he was under the influence of Percocet and marijuana during the interview, having smoked marijuana in the Justice Center and taken 30 Percocet pills in the transport vehicle after being arrested and additional pills in the homicide interview room. Appellant asserted he advised the detectives he had taken the drugs prior to the interview. Appellant stated he told the detectives while being transported he did not want to talk to them and wanted an attorney but did not ask again later because they had ignored his first request. Appellant denied reading the Miranda warning and waiver form before signing it.

The trial court denied Appellant's motion, finding Appellant had been read his rights before making the statement and that his statement was knowingly and voluntarily made.

Upon a defendant's challenge to the admissibility of a statement on the ground that it was involuntary, the State has the burden of proving the voluntariness of the statement by a preponderance of the evidence. State v. Rousan, 961 S.W.2d 831, 845 (Mo. banc 1998). When reviewing a trial court's ruling on a motion to suppress, the inquiry is limited to whether the court's decision is supported by substantial evidence. Id. We give deference to the trial court's superior opportunity to determine the credibility of the witness and to the court's factual findings and credibility determinations. Id. This Court views the facts and the reasonable inferences therefrom in the light most favorable to the court's decision. State v. Kelly, 119 S.W.3d 587, 592 (Mo. App. E.D. 2003). Questions of law are reviewed *de novo*. Rousan, 961 S.W.2d at 845. The trial court's ruling on a motion to suppress evidence will be affirmed unless it is clearly erroneous. State v. Davis, 980 S.W.2d 92, 94 (Mo. App. E.D. 1998).

The Fourteenth Amendment Due Process Clause bars involuntarily-obtained confessions from being admissible at trial. State v. Faruqi, 344 S.W.3d 193, 203 (Mo. banc 2011), citing Ashcraft v. Tennessee, 322 U.S. 143, 155 (1944). "The test for whether a confession is voluntary is whether the totality of the circumstances created a physical or psychological coercion sufficient to deprive the defendant of a free choice to admit, deny, or refuse to answer the examiner's questions." Faruqi, 344 S.W.3d at 203 (internal quotations omitted). In order for a defendant's statements to be considered involuntary due to coercive tactics by the police, it must be demonstrated that the

11

defendant's "will was overborne" as a result of said tactics. State v. Mateo, 335 S.W.3d 529, 537 (Mo. App. W.D. 2011).

In determining whether a defendant's confession resulted from improper coercion, this Court considers factors such as age, experience, intelligence, gender, lack of education, infirmity, and unusual susceptibility to coercion. Faruqi, 344 S.W.3d at 203. The Court also considers whether the defendant was advised of his rights and understood them, the length of the detention, the repeated and prolonged nature of the questioning, the presence of police coercion and intimidation, and the use of coercive techniques such as deprivation of food, water, or other physical needs. Id.; Rousan, 961 S.W.2d at 845. When considering the totality of the circumstances, no single fact is dispositive. State v. Lytle, 715 S.W.2d 910, 915 (Mo. 1986). "Evidence of the defendant's physical or emotional condition alone, absent evidence of police coercion, is insufficient to demonstrate that the confession was involuntary." Rousan, 961 S.W.2d at 845.

On appeal, Appellant asserts the testimony and evidence concerning his statements to police should have been suppressed as unknowingly, unintelligently, and involuntarily made in that he did not understand his Miranda rights, lacked the capacity to understand his rights, and did not knowingly and intelligently waive his rights. Appellant maintains his confession was the product of a coercive interrogation because the detectives took unfair advantage of his youth, grief, questionable cognitive abilities, drugged state, and isolation from his family to obtain the statements. Appellant further contends the detectives utilized coercive police tactics through repeated and prolonged questioning, the deprivation of food and sleep, the denial of Appellant's request for an attorney, and threatening to charge Appellant's brothers with the crime.

Contrary to Appellant's assertions, the evidence presented at the hearing and during trial demonstrates Appellant was advised of his rights, understood his rights, and that his statements were not the result of coercive police activity. First, Appellant was 25 years old when he was detained and interviewed regarding Victim's murder, old enough to talk to the police without a family member being present.

Next, Appellant suggests "his cognitive abilities were questionable" because he did not graduate from high school and the detectives did not ask him if he could read or write, yet provides no explanation as to how these affected his ability to understand his rights. See Howard v. Caspari, 99 F.3d 895, 898 (8th Cir. 1996) (alleged inability to read and write does not necessarily render a confession involuntary). The detectives orally advised Appellant of his rights, to which Appellant answered "Yes" or "Yeah" when asked if he understood those rights. The detectives explained the Miranda warning form, so Appellant's ability to read or write was of no consequence and did not serve to invalidate his waiver of those rights. State v. Day, 987 S.W.2d 824, 825 (Mo. App. E.D. 1999) (defendant may waive Miranda rights by orally indicating a willingness to cooperate in police questioning without signing a written waiver).

With regard to Appellant's grief and alleged intoxication, Det. Strohmeyer testified Appellant composed himself before the interview began, Appellant did not appear to be under the influence of intoxicants, and Appellant seemed to understand the questions being asked.

Appellant's assertion that he was deprived of food and sleep and was subjected to repeated and prolonged questioning is also without merit. Appellant was questioned for slightly more than two hours. Appellant, again, fails to cite to anything in the record

suggesting his "will was overborne" by the length of the interview. See Mateo, 335 S.W.3d at 537. Two hours is not an unduly long period of time and does not, in and of itself, support a finding that the length of questioning was coercive. See Rousan, 961 S.W.2d at 846 (police questioning for three and one-half hours was not coercive). Further, the evidence indicates Appellant brought something to drink to the interview and was offered, but refused, additional food and drink. Although Appellant testified during the hearing on the motion to suppress that he had not slept the night before, Appellant later testified at trial he did sleep the night before the interview.

Finally, Appellant's assertions that the detectives ignored his request for an attorney and threatened his brothers with criminal charges are questions of fact and credibility to be decided by the trial court. Det. Strohmeyer testified Appellant did not request an attorney and that he neither threatened Appellant nor made any promises to Appellant in order to procure a statement from him. The trial court was entitled to believe the testimony of the officers. State v. Davis, 32 S.W.3d 603, 610 (Mo. App. E.D. 2000).

Viewing the evidence in the light most favorable to the trial court's decision, we find, under the totality of the circumstances, that Appellant's statements to police were made knowingly, intelligently, and voluntarily. Appellant was advised of his Miranda rights, which Appellant stated he understood. Appellant was neither detained nor questioned for an undue length of time and there is no evidence Appellant was deprived of food, water, or any other physical need. Appellant was not threatened and Appellant never asked to stop the questioning or to speak to an attorney.

14

There is no evidence that Appellant's confession was the result of coercion, which overbore his will and deprived him of his free choice to admit, deny, or refuse to answer the detectives' questions. See Faruqi, 344 S.W.3d at 203; Mateo, 335 S.W.3d at 537. The trial court did not err in denying Appellant's motion to suppress. Appellant's Point II is denied.

## Point III − Admission of Evidence

Prior to trial, Appellant sought to redact portions of his videotaped statement to police. While some portions were redacted, the court denied Appellant's request to remove statements that (1) Appellant had been in Youth Services, (2) Appellant was confronted about some fake money and was shot at, (3) Appellant denied having the nickname D-Murder, (4) Appellant was threatened by Darrell Scott so he hid his rifle in a gangway, and (5) Appellant attempted to purchase marijuana.

The trial court has broad discretion when ruling on the admission or exclusion of evidence at trial, and this Court will not disturb the court's ruling absent a showing of an abuse of that discretion. State v. Kemp, 212 S.W.3d 135, 145 (Mo. banc 2007). The court abuses its discretion when its ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. Id. We will reverse on claims of error in the admission of evidence only if the error was so prejudicial that it deprived the defendant of a fair trial. Id. "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." Id. at 145-46.

To be admissible, evidence must be both logically and legally relevant. State v. Barriner, 111 S.W.3d 396, 400-01 (Mo. banc 2003). Evidence is logically relevant when

15

it has a legitimate tendency to directly establish the defendant's guilt of the charges and is legally relevant when its probative value outweighs its prejudicial value. State v. Blakey, 203 S.W.3d 806, 811 (Mo. App. S.D. 2006).

On appeal, Appellant maintains the trial court abused its discretion in allowing the State to present the challenged evidence because the evidence was used as improper propensity evidence and was more prejudicial than probative.

Generally, evidence of uncharged crimes is inadmissible unless it has a legitimate tendency to establish the defendant's guilt of the crime charged and is not merely used to show the defendant's bad character or predisposition to commit the crime. State v. Henderson, 826 S.W.2d 371, 374 (Mo. App. E.D. 1992). Evidence of uncharged crimes that are part of the circumstances or sequence of events surrounding the charged offense is admissible to present a complete and coherent picture of the events that transpired. State v. Harris, 870 S.W.2d 798, 810 (Mo. banc 1994). Vague references to other uncharged crimes are insufficient to warrant reversal. State v. Key, 437 S.W.3d 264, 270 (Mo. App. W.D. 2014). "'The defendant's association with other crimes must be clear and definite to run afoul of the general rule of inadmissibility.'" Id., quoting State v. Slagle, 206 S.W.3d 404, 410 (Mo. App. W.D. 2006).

Division of Youth Services

In his videotaped statement, Appellant stated he had been in trouble as a juvenile for truancy and was sent to Youth Services. In light of Appellant's confession to shooting Victim, there is not a reasonable probability that Appellant's earlier fleeting reference to truancy as a juvenile affected the outcome of the trial. Kemp, 212 S.W.3d 145-46.

16

<u>Fake Money</u>

The trial court refused to redact Appellant's statements denying that a couple of days before Victim was killed, he was confronted by some people over some fake money and that they chased and shot at him. Appellant asserts this was evidence of his prior bad acts. Whether someone perpetrated a crime against Appellant by chasing him and shooting at him is not evidence of uncharged criminal conduct on the part of Appellant. The only potential reference to an alleged prior bad act is a vague reference to "fake money." Even if it could be said that this is evidence of a prior bad act or uncharged criminal conduct, there is not a reasonable probability that this vague and passing reference affected the outcome of the trial. <u>Kemp</u>, 212 S.W.3d 145-46.

<u>Hidden Gun</u>

In his taped confession, Appellant told the detectives he had been threatened by a man named Scott and had hidden a rifle in a nearby gangway. On the day of the murder, an argument broke out between Appellant, Scott, and several other men. One person pulled a gun and fired at Appellant, who ducked. Appellant said the shooter and two other men, including Victim, ran into an apartment building. Appellant stated he grabbed the gun from the gangway, followed the men into the building, and fired about two shots.

On appeal, Appellant argues the trial court erred in allowing the State to introduce his statement that he had hidden his rifle in a gangway after being threatened by Scott. The trial court did not err in allowing the State to present this evidence because it went directly to the circumstances or sequence of events surrounding the murder. See <u>Harris</u>, 870 S.W.2d at 810.

<u>Alleged Nickname</u>

Twice during Appellant's videotaped statements, Det. Strohmeyer asked Appellant whether his nickname was D-Murder, which Appellant denied. Appellant contends the trial court erred in failing to redact those portions of the video.

"Courts frequently allow witnesses to refer to a criminal defendant by his nickname, if that is the name by which the witness is familiar with the defendant or if it aids in the identification of the defendant." <u>State v. Nettles</u>, 10 S.W.3d 521, 526 (Mo. App. E.D. 1999). Here, the references to D-Murder explained the context of how Appellant was identified to the detectives as a potential suspect.

Even if this evidence was admitted in error, Appellant has not demonstrated he was prejudiced by the admission. The evidence regarding Appellant's alleged nickname was, at best, a vague reference to uncharged criminal conduct and the State did not emphasize this evidence during trial or closing arguments. Again, Appellant has failed to demonstrate there is a reasonable probability this evidence affected the outcome of the trial.

<u>Attempted Marijuana Purchase</u>

Appellant argues the trial court committed reversible error in allowing the State to admit evidence that he attempted to purchase marijuana prior to the murder. This evidence was relevant to paint a complete picture of the circumstances surrounding the shooting as it explained why, on the day of the murder, Appellant was in the company of people who had previously threatened him. Furthermore, there is not a reasonable probability that this brief reference to Appellant attempting to purchase marijuana affected the outcome of the trial in light of Appellant's trial testimony that he had

Percocet and marijuana in his possession when arrested and that he consumed these drugs after his arrest.

Based on the foregoing, Appellant's Point III is denied.

<u>Point IV − Request to Proceed *Pro Se*</u>

An assistant public defender, Mr. Shellenbergar, was assigned to represent Appellant. Prior to trial, Appellant sent a letter to the court complaining about Mr. Shellenbergar's representation and asking the court to appoint him new counsel.

On the day of trial, the court conducted an inquiry into Appellant's request. Appellant indicated he had not hired a new attorney to replace Mr. Shellenbergar but instead wished "to file for another lawyer." When the court asked if Appellant was asking for a new lawyer or to represent himself, Appellant complained about the representation he had received. Mr. Shellenbergar was given, and took, the opportunity to respond. The court denied Appellant's request to discharge counsel but presented Appellant with the choice of proceeding either with Mr. Shellenbergar or *pro se*. Appellant indicated he wanted to proceed without Mr. Shellenbergar and again complained about the representation he was receiving. The court then took a short recess to allow Appellant to consider his options. After the recess, Appellant again stated he did not want Mr. Shellenbergar as his attorney.

When the court questioned Appellant to establish that he was knowingly waiving counsel, Appellant responded by repeatedly asking how he could force Mr. Shellenbergar to do what he wanted. Appellant continued to discuss what witnesses and evidence he wanted to present at trial and his belief that the police investigation was inadequate.

The court denied Appellant's motion to remove Mr. Shellenbergar from the case and found that while Appellant understood his right to counsel and did not want Mr.

19

Shellenbergar to represent him, he was not intelligently and voluntarily waiving his right to counsel and seeking to represent himself. The following discussion then occurred:

> [THE COURT]: Because I don't even think what you're really asking me is to represent yourself. You're not really saying, Judge, I want to proceed without a lawyer. You're simply saying I want to proceed without this particular lawyer. Isn't that right?
> THE DEFENDANT: Yes.
> THE COURT: Okay. And because of that, I'm telling you that your options are Mr. Shellenbergar or nothing. And after talking to you, I'm not comfortable at all with you representing yourself, meaning I'm taking off the nothing option. Which means I'm denying your motion at this time and I'm going to leave Mr. Shellenbergar on the case.
> …
> I'm comfortable after speaking with you and the issues that you've raised that I don't think you could represent yourself. In fact, I don't even think you want to represent yourself. You're just simply asking for a different lawyer, and I'm saying that's not an option at this time. Okay?
> THE DEFENDANT: And why is it not an option?
> THE COURT: Because it's eighteen months into trial and you don't have a -- you don't have somebody else standing by.

On appeal, Appellant argues the trial court abused its discretion in denying his motion to waive his counsel and proceed *pro se* because the request was reasonable under the circumstances and its denial resulted in prejudice to Appellant.

A criminal defendant has a constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so. State v. Johnson, 943 S.W.2d 285, 290 (Mo. App. E.D. 1997), citing Faretta v. California, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In order to invoke this right, the defendant's request to proceed *pro se* must be unequivocal and timely made. Johnson, 943 S.W.2d at 290. Without an unequivocal request to exercise the right to self-representation, it cannot be said that the right was denied. Id. Ambiguous requests are not sufficient to assert the right to self-representation. State v. Black, 223 S.W.3d 149, 153 (Mo. banc 2007).

Here, Appellant never made an unequivocal request to represent himself. Appellant's written motion requested the court to appoint him new counsel. On the day of trial, the court conducted a lengthy inquiry into Appellant's motion, at which time Appellant repeatedly stated he wanted the court to appoint new counsel to represent him. Absent an unequivocal request, the trial court did not deny Appellant his right to self-representation. Appellant's Point IV is denied.

Point V − Photograph of Victim

At a bench conference before opening statements, Appellant objected to State's Exhibit 1, a photograph of Victim holding a puppy. Appellant argued the image of the puppy was unnecessary and could be blocked out. The prosecutor responded that the puppy was not inflammatory, the photo had already been cropped, and further cropping of the photo would leave a tiny photograph. The court overruled Appellant's objection.

At trial, the State showed the photograph to its first witness, Harris, who identified it as a picture of Victim taken the day before he died. Harris testified Victim was wearing the same shirt in the photo that he was wearing the day of the murder.

On appeal, Appellant argues the trial court abused its discretion in allowing the State to admit the photograph into evidence because it was more prejudicial than probative and deprived Appellant of his right to due process, a fair trial, and to a fair and impartial jury. Appellant maintains the image of the dog invoked sympathy for Victim and served only to "inflame the passions and prejudice of the jury and to divert the jury's attention from fair and impartial consideration" of Appellant's guilt. Appellant asserts the dog could have been removed from the photograph and the enlarged display of this photo at trial exacerbated the emotional and inflammatory nature of the photograph.

The trial court has broad discretion when ruling on the admission or exclusion of evidence at trial, and this Court will not disturb the court's ruling absent a showing of an abuse of that discretion.  Kemp, 212 S.W.3d at 145.  We will reverse on claims of error in the admission of evidence only if the error was so prejudicial that it deprived the defendant of a fair trial.  Id.  "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial."  Id. at 145-46.

A photograph is admissible in a criminal case if it "corroborates the testimony of a witness, connects the accused with the offense, provides the identity of a victim, or tends to prove any material elements in the case."  State v. Davis, 653 S.W.2d 167, 174-75 (Mo. banc 1983), overruled on other grounds by Kuyper v. Stone County Comm'n, 838 S.W.2d 436 (Mo. banc 1992).  Here, the photograph was admissible to aid in the identification of Victim.

At trial, the State addressed Appellant's assertion the dog could be removed from the photograph, explaining the photo had already been cropped and that further manipulation of the photograph would result in a very small photo.  In the photo, Victim is holding the dog in front of him and to his upper left.  Completely removing the dog from the photograph would result in either oddly cut angles or a less than two-inch by one-and-one-half-inch image of Victim's face.  It was not necessary for the State to present an irregular photograph in order to remove the dog from Victim's photograph, as there is not a reasonable probability that the inclusion of the dog's image affected the outcome of the trial.  The trial court did not abuse its discretion in admitting the

22

photograph into evidence as its probative value outweighed any prejudicial effect.

Appellant's Point V is denied.

Point VI – Post-Trial Request to Contact Juror

Appellant filed a post-trial request to contact a juror pursuant to Local Rule 53.3, seeking to obtain the testimony of Juror 1975 to support his Motion for New Trial. At the hearing on the motion, defense counsel asserted that during the polling of the jury following the guilty verdict, Juror 1975 was "flat out sobbing" and that another juror was "consoling her" by patting her on the back. Defense counsel indicated he wanted to determine if Juror 1975 made an independent finding of guilt after further deliberation or if she was coerced into entering a verdict after speaking with the court.

The trial court denied the request, noting the jury deliberated for several hours after the court's conversation with Juror 1975 and that jurors sometimes cry after entering difficult verdicts because the process can be emotional.

On appeal, Appellant contends the trial court erred in denying his request to contact or question Juror 1975 because her testimony was necessary for purposes of Appellant's motion for new trial, in that if Juror 1975 had been coerced into finding Appellant guilty during deliberations, Appellant did not have a fair and impartial jury and is entitled to a new trial.

Courts have discretionary power to grant permission for contact with jurors after a trial. Strong v. State, 263 S.W.3d 636, 643 (Mo. banc 2008). Local Rule 53.3 of the Twenty-Second Judicial Circuit provides:

> No attorney or client, their agents or representatives, shall contact any member of a jury which has heard evidence in any cause in this circuit; provided, however, the court in its discretion may grant permission to attorneys or clients to discuss a case with jurors immediately after the

23

return of a verdict; provided further, the court may also allow contact with jurors if necessary for purposes of a timely after-trial motion filed under Missouri Supreme Court Rules.

Use of information obtained from jurors after a trial is limited and juror testimony is excluded from consideration on post-judgment matters. Strong, 263 S.W.3d at 643. "The rule is perfectly settled, that jurors speak through their verdict, and they cannot be allowed to violate the secrets of the jury room, and tell of any partiality or misconduct that transpired there, nor speak of the motives which induced or operated to produce the verdict." State v. Babb, 680 S.W.2d 150, 152 (Mo. banc 1984). A juror may not impeach a unanimous, unambiguous verdict after it is rendered. State v. Carter, 955 S.W.2d 548, 557 (Mo. banc 1997). Nor may a jury's verdict be impeached by a juror's testimony about jury misconduct that allegedly affected deliberations. State v. West, 425 S.W.3d 151, 154-55 (Mo. App. W.D. 2014). There are two narrow exceptions to the general rule: (1) it is permissible to elicit testimony about juror misconduct that occurred outside the jury room, such as the gathering of extrinsic evidence, and (2) when a juror makes statements evincing ethnic or religious bias or prejudice during deliberations. Id. at 155.

Neither of these limited exceptions applies to this case. Instead, Appellant seeks to question Juror 1975 with the lone intention of impeaching the unanimous and unambiguous verdict entered by the jury, an action which is strictly prohibited. The trial court did not abuse its discretion in denying Appellant's motion to contact Juror 1975 after trial. Appellant's Point VI is denied.

<u>Conclusion</u>

The judgment of the trial court is affirmed.


_____
Sherri B. Sullivan, P.J.

Patricia L. Cohen, J., and
Kurt S. Odenwald, J., concur.

25